**Ann BATTERBEE, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 50980.

Court of Criminal Appeals of Texas.

May 19, 1976.

Percy Foreman and Dick DeGuerin, Houston, for appellant.

Carol S. Vance, Dist. Atty., and James C. Brough, Alvin M. Titus, and John Pizzitola, Asst. Dist. Attys., Houston, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

OPINION

DOUGLAS, Judge.

This is an appeal from a conviction for the offense of murder with malice after a trial before the court. Punishment was assessed at ten years, probated.

Appellant challenges the sufficiency of the evidence. The State's case is founded primarily on the statement made by appellant after the deceased's death and the testimony of Dr. Joseph Jachimczyk, Harris County medical examiner. The State introduced evidence that appellant wanted to divorce her husband and that she wanted him dead. Even though she might have wanted to kill him, the question is did she cause the death of Vernon Batterbee?

The indictment, omitting the formal parts, is as follows:

"Ann Batterbee on or about the 12th day of April 1973, in said County and State did with malice aforethought kill Vernon Batterbee by causing him to swallow secobarbital so administered did cause the death of the said Vernon Batterbee."

On May 9, 1973, appellant made a statement. Omitting the formal parts, it is as follows:

"I would like to give Det. Oviedo the following voluntary statement:

"After reading the other statement that I gave I wish to give this statement to make some changes and tell the complete truth.

"On Thursday 4–12–73 after Vernon and I had relations, about 20 to 30 minutes later he asked for a glass of milk. I took the glass of milk into the bedroom and Vernon had some Seconal pills in his hand. I don't know how many but it was over two. He took the pills and drank the glass of milk and laid back in bed. After 40 minutes later I went into the bedroom and Vernon was asleep. I took 4 Seconal capsules from a Bufferin bottle that was on the dresser in the bedroom. I got a glass of water from the bathroom in the bedroom.

"He was laying with his head up asleep and I opened his mouth and put one Seconal capsule in the back of his tongue and closed his mouth and he swollowed it. I repeated this three other times for a total of 4 Seconal capsule and then poured a little water in his mouth and he swollowed them. The Seconal capsule that I gave him came from the same bufferin bottle that I gave Dts. Oviedo and Merchant today at my house. I put the bottle of Seconal capsules in the drawer of the dresser in the bedroom after I gave him the 4 Seconal capsules, before the Doctor got there. I would like to say that I learned and have seen patients being given pills when they are asleep and is why I knew how to do it when a person is sleeping. I was work-ing for a Doctor at the hospital and is where I saw it.

"I would also like to say that when my babies were small Vernon never did stay home on week-ends and never did help with the babies. He would always go out with his buddies on weekends. He told me when I got pregnant, 'you had the children, you raise them.' . . ."

Dr. J. C. Holsomback, the family doctor of the Batterbees, was summoned by the appellant to their home on two occasions during the month of April, 1973, the 8th and 12th. He testified that appellant had called him on the 8th day of April because her husband was sick. When he arrived at the Batterbee home,

"Vernon was comatose, he was also cyanotic, he had labored breathing, he was stuperous and couldn't be aroused and was vomiting and the vomitous was bloody. He was gurgling as though he had aspirated some of this vomitous back into his trachea and bronchial tubes."

The patient was immediately taken to the intensive care unit of Baytown Medical Care Center Hospital where his stomach was pumped out and his mouth, throat and upper trachea were suctioned out. He testified that Vernon Batterbee was near death but no medical determination of the cause was made by way of laboratory tests, but ". . . he was in what appeared to be a real deep effective sedative drug, almost to the stage of anesthesia . . ." The doctor further testified that when he arrived at their home on April 12th he found that Vernon Batterbee had expired, "[t]here was no pupilary signs, no breathing, no heart motion, no heartbeats." Dr. Holsomback had been treating Vernon for what he thought was narcolepsy, "a syndrome where you go to sleep more easily than usual." On April 11, 1973, he prescribed an antidepressant drug, because "Mr. Batterbee seemed to be in a depressed, somewhat withdrawn mental state, worried about some difficulties, we didn't know what the difficulties were".

Dr. Jachimczyk testified that he had performed an autopsy on the body of deceased

at 3:40 p. m. on April 12, 1973. Laboratory tests which were run to test for the presence of barbiturates were positive, the level in the blood was found to be 1.6 milligrams percent of secobarbital, the trade name for that is Seconal, a type of sleeping drug. Dr. Jachimczyk stated:

"There will be certain amount present if the drug is used to induce sleep. There will be another amount required for a toxic level; that is one that might cause a person to have an overdose and show symptoms thereof; and then there's yet another amount that would be termed lethal, that would be the amount necessary to cause death."

He testified that in most people the level of 1.0 milligrams percent or higher will cause death, depending usually on the size of the individual and whether or not the patient was a drug addict, thereby allowing him to sustain a much higher level and survive. He testified that Vernon Batterbee died as a result of secobarbital poisoning. He related that he had rendered three opinions as to the manner of death. The pertinent part of the first autopsy report of April 12, 1973, is as follows:

"It is our opinion that the decedent, Vernon Arnold Battarbee, came to his death as a result of acute barbiturate poisoning (Secobarbital), suicide."

Then on May 17, 1973, the autopsy report contains the following:

"Subsequent to the initial investigation concerning the circumstances of death, it has come to our attention that the decedent's wife admitted to have purposefully fed him a lethal amount of seconal capsules; accordingly, an amended death certificate has been issued stating the manner as homicide, instead of suicide as originally indicated."

Finally, on March 15, 1974, a second amended opinion which appears in the record reads, in part, as follows:

"Subsequent to the deposition of March 8, 1974, and check of mathematics re secobarbital, I am unable to determine the manner of death beyond a reasonable doubt as required by law; accordingly, it is our opinion that the decedent, Vernon Arnold Battarbee came to his death as a result of secobarbital poisoning, manner undetermined."

Dr. Jachimczyk testified that his first amended opinion was based on the police offense report, written statements of witnesses including appellant's statement. His subsequent amended opinion was issued as a result of mathematical errors made known to him during an oral deposition he gave on March 8, 1974. On direct examination he testified that ten one hundred milligram capsules would bring the blood level to 1.0, previously referred to by him as the "lethal level". Then by simple mathematical computation, sixteen tablets would bring the level to 1.6 milligram percent. He originally felt that three to four capsules would have brought the blood level to "between .09 and 1.2 . . ." He related that his mathematical error and recomputation caused him to change his first amended opinion as to manner of death from "homicide" to "manner undetermined." The doctor stated that he could not render ". . . an opinion beyond a reasonable doubt or beyond all doubt as to the manner of death." He examined the contents of State's Exhibit No. 4, a bottle which contained two types of medication, a pink capsule and a white-scored tablet. The pink capsule, of which there were several, was identified as a 100 milligram Seconal capsule manufactured by Lilly. He testified that the deceased's stomach contained one-half pint of viscid gray, mottled with tan-brown and containing pink particular matter which appeared to be the pink Seconal capsular material. The stomach did not contain tranquilizers. He had no way without a test of determining the amount of secobarbital, if any, in the stomach.

Dr. Jachimczyk further testified that he changed his original opinion from suicide to homicide, in part, because of appellant's statement that her deceased husband had taken two pills and she had given him four and according to his first computation this would have been a lethal dose. The statement that for each of such pills taken the

blood level will rise .1 milligram was based on the assumption that an individual weighed 150 pounds. Vernon Batterbee weighed 189 pounds. He testified that normally seven percent of the total weight of a person is blood, thus it would take more than one pill to raise the blood level to .1. Thus, instead of sixteen pills to get the level found in Vernon Batterbee's body, it would take nineteen pills in terms of medical probability. He further testified that to obtain a lethal level it would take twelve pills instead of ten. In response to continued questions on cross-examination, Dr. Jachimczyk stated that nineteen pills had to be absorbed into the deceased's body, that if in fact appellant had given him only four as indicated in her statement, then the deceased would have taken fifteen pills which would have been a lethal dose. Since fifteen pills would have been fatal, there was no way to tell whether or not the last four were absorbed. Dr. Jachimczyk related that once a person reaches the state of irreversible shock, death is certain and nothing can be done for the person. He stated that the deceased could have gone into irreversible shock at the 1.0 level up to the 1.6 level because, generally speaking, one could go into irreversible shock only if he received a lethal level. However, irreversible shock could have set in after eight pills or as low as the .5 level, or at any point up to the nineteen pills which had been absorbed. There was a half pint of liquid in the stomach. Under the tests made there was no way to know the total amount of pills that Vernon Batterbee took. The equivalent of four secobarbital pills, or as many as eight, could have remained in the stomach.

Don Hightower, an extramarital lover of appellant, testified that he had known her and that they had sexual intercourse frequently for some ten years up to approximately the first of April in 1973. He related that during their last meeting appellant told him she was pregnant. Medical testimony was introduced to show that she was not pregnant. There was evidence that appellant wanted a divorce from the deceased.

Joy Owens testified that appellant had told her that ". . . she prayed every night that God would take him and I wouldn't believe the hate she had for him in her heart." When asked about any conversations with appellant on April 8, 1973, Miss Owens replied that appellant had told her at the hospital, "If I had waited five more minutes, he would have been dead . . . I thought he was when I called the doctor." Further, appellant had told her on many occasions of her desire to marry Don Hightower and that during the course of a conversation with appellant on April 10, 1973, appellant had related that she had had an argument with the deceased the previous evening and that he had accused her of giving him the drugs and that she wished he had died. Miss Owens also testified that on April 27, 1973, appellant had told her that she was going to have an abortion and it would cost $150, but that the doctor had told her it would be too dangerous. In February 1973, appellant asked her how to kill someone and not get caught. She did not think appellant was serious about killing Vernon Batterbee.

■ Corpus delicti in a prosecution for murder consists of two elements: (1) that the body or the remains of the body of the deceased be found and identified, and (2) that the death of the deceased was caused by the criminal act of another. Proof of the corpus delicti may not be made by an extrajudicial confession alone, but proof of the corpus delicti need not be independent of an extrajudicial confession. If there is some evidence corroborating the confession, the confession may be used to and in the establishment of the corpus delicti. *Self v. State*, 513 S.W.2d 832 (Tex.Cr.App.1974).

■ The indictment alleged that the appellant caused the death of Vernon Batterbee by causing him to swallow secobarbital. The evidence shows that he died as a result of secobarbital poisoning, and that appellant gave him secobarbital pills. Therefore, the issue remaining unresolved by the evidence is whether appellant gave to the deceased sufficient secobarbital to bring about his death or did the deceased bring

about his own death. If the latter is true, then the crime of murder was not committed. According to appellant's statement, deceased took at least two pills and she gave him four more. The evidence shows that as few as eight pills could have caused him to go into irreversible shock, a condition which the evidence shows results in certain death. The deceased was in a depressed state the last days of his life. It may be reasonably inferred from this record that he had attempted to take his own life only three days earlier. Ill feelings existed between appellant and the deceased, and appellant had been involved in an illicit love affair for ten years. And while the record reflects that the circumstances surrounding the deceased's death are very suspicious, the evidence considered in the light most favorable to the finding of guilt by the trial court is insufficient as a matter of law.

This is not like a case where one is dying and another inflicts a fatal blow hastening death, because the proof in this case does not show that the four secobarbital pills resulted in, or contributed to, Vernon Batterbee's death.

The judgment is reversed and the cause remanded.