Robert Lee WHITE, Appellant,

v.

The STATE of Texas, Appellee.

No. 57998.

Court of Criminal Appeals of Texas, En Banc.

Dec. 12, 1979.

Rehearing Denied Jan. 16, 1980.

John A. Mann, Amarillo, Robert Michael Brown, Lubbock, for appellant.

Alton R. Griffin, Dist. Atty., C. Michael Ward, Asst. Dist. Atty., Lubbock, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder committed in the course of committing the offense of robbery. V.T.C.A., Penal Code, § 19.03. The punishment was assessed by the court at life imprisonment in response to the jurors' answers submitted to them under Article 37.071, V.A.C.C.P.

On appeal appellant raises the question of how many peremptory challenges he is entitled in a competency to stand trial hearing, contends the verdict at the competency hearing was contrary to the great weight and preponderance of evidence and was

manifestly wrong, contends the court erred in excusing five prospective jurors for "economic reasons" without his presence or consent in violation of Article 2120, V.A.C.S., urges that a State's challenge for cause was improperly sustained when the prospective juror was not disqualified under the test of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), contends the court erred in admitting into evidence his extrajudicial confession, and challenges the sufficiency of the evidence to sustain the conviction.

Appellant raises a question of first impression which was sure to follow, sooner or later, in the wake of *Jackson v. State,* 548 S.W.2d 685 (Tex.Cr.App.1977). Appellant contends the court erred in refusing his request for fifteen peremptory challenges during the voir dire examination of prospective jurors at the competency to stand trial hearing. Appellant argues that since he was charged with capital murder and was entitled to fifteen peremptory challenges on the trial on the merits, Article 35.15(a), V.A.C.C.P., he was likewise entitled to the same number of such challenges at a pretrial competency hearing. The trial court gave the appellant ten peremptory challenges.[1]

Neither Article 46.02, V.A.C.C.P., nor any other part of the 1965 Code of Criminal Procedure specifies the number of peremptory challenges in a competency hearing. The former Codes of Criminal Procedure likewise did not specify any such number. Further, no decisional law developed in this area because until *Jackson v. State,* 548 S.W.2d 685 (Tex.Cr.App.1977), there was no appellate review of competency hearings. As noted in *Jackson,* the earlier cases dealt solely with attempted direct appeals from a judgment entered in a competency hearing or attempted appeals from sanity hearings *after* a conviction. These cases held that there were no appeals from these hearings because the Court of Criminal Appeals had no jurisdiction in light of Article V, § 5, Texas Constitution, as there was no punishment assessed, no conviction was being appealed, and therefore the case was not a "criminal case" in light of Article V, § 5, Texas Constitution. See, i.e., *Griffin v. State,* 29 S.W.2d 349 (Tex.Cr.App.1930); *Hardin v. State,* 157 Tex.Cr.R. 283, 248 S.W.2d 487 (1952). The question of whether the issues involved in a competency hearing could be reviewed if the hearing was brought up on appeal from a conviction was left open. *Griffin v. State,* supra. This question was foreclosed, however, by *Pena. v. State,* 167 Tex.Cr.R. 406, 320 S.W.2d 355 (1959), holding no appeal would lie even if brought up on appeal of a conviction on the trial on the merits. *Jackson,* however, overturned *Pena* and its progeny, and held that there could be appellate review where the competency hearing is brought forward with an appeal from a conviction on the trial on the merits and an issue as to the competency hearing is duly raised. It was inevitable that in light of *Jackson* a question such as now presented would arise. A study of some of the records before this court reflects that in the past when there was no appellate review of competency hearing that the number of peremptory challenges permitted often varied from district court to district court. Some judges permitted fifteen peremptory challenges if the defendant was charged with a capital felony and ten peremptory challenges if the defendant was charged with a non-capital felony. See Article 35.15(a) and (b), supra. Still others, relying upon the nature of the proceedings, concluded that six peremptory challenges as permitted in civil cases were the proper number of such challenges to be permitted. See Rule 233, Texas Rules of Civil Procedure.

■ Article 46.02, § 4, V.A.C.C.P., makes it clear that a competency hearing is to be a separate and independent hearing before a different jury than the one on the trial on the merits. *Cavender v. State,* 515 S.W.2d 277 (Tex.Cr.App.1974); *Perryman v. State,* 494 S.W.2d 542 (Tex.Cr.App.1973).

While *Jackson* referred to the competency hearing as "quasi-criminal in a sense"

1. Cf. Article 35.15(b), V.A.C.C.P.

and *Pena* referred to such hearing as "another separate trial, not strictly criminal in nature . . .," neither explored at length the nature of the hearing. *Hardin* noted, however, that such hearing was not a "criminal case."

Article 46.02, § 4(d)(1) and (2), V.A.C.C.P. (Acts 1975, 64th Leg., p. 1095, ch. 415),[2] sets forth the issues to be submitted to the jury at a competency hearing:

"(1) whether the defendant is incompetent to stand trial; and

"(2) if found incompetent to stand trial, whether there is no substantial probability that the defendant will attain the competency to stand trial within the foreseeable future."

These issues are not criminal in nature. While a defendant may be under pending criminal charges, the issue of his guilt or innocence is not to be determined and punishment is not to be assessed at the competency hearing, therefore the issues to be determined are neither capital nor non-capital in the sense those terms are normally used.

Further, Article 46.02, § 1(b), as amended provides:

"A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence."

■ Thus, the burden of proof in a regular competency hearing will be on the defendant and not the State. We conclude after consideration of the nature of a competency hearing, that although ancillary to a criminal charge, the hearing is civil in nature, and therefore Rule 233 of the Texas Rules of Civil Procedure should control and that the defendant and the State should be permitted six peremptory challenges each. We reject the argument that the number of

peremptory challenges in a competency hearing should vary depending upon whether the felony charge is capital or non-capital.[3] The appellant relies upon *Batten v. State,* 533 S.W.2d 788 (Tex.Cr.App.1976). *Batten* did not deal with a competency hearing but with a trial on the merits on a charge of capital murder. *Batten* held a defendant was still entitled to fifteen peremptory challenges despite the highly unusual fact situation where the State had been presumed to have waived the death penalty. Reliance on *Batten* is misplaced.

In the instant case, appellant was accorded four more peremptory challenges than he was entitled to under said Rule 233. His contention is overruled.

■ In another ground of error, appellant asserts that the jury's verdict at the competency hearing was "so contrary to the great weight and preponderance of the evidence as to be manifestly wrong and unjust."

Appellant candidly argues that he does not contend there is not some probative evidence in support of the verdict, but contends it is so contrary to the great weight and preponderance of the evidence the verdict must be set aside by this court.

Appellant presented the testimony of a psychiatrist, two clinical psychologists, one of his counsel and a lay witness who was a jail visitor. The State offered the testimony of a neurologist and a radiologist. Appellant argues that his psychiatrist and the two clinical psychologists were well qualified to express an opinion as to his competency because of their training, background and experience and in light of the tests administered to him by them. He observes that the two doctors called by the State were experts in neurology and radiology,

2. The 1975 amendment to said Article 46.02 was in effect at the time of appellant's competency hearing. Now see Acts 1977, 65th Leg., p. 1458, ch. 596, eff. Sept. 1, 1977, amending Article 46.02. Nothing quoted in this opinion was changed by the 1977 amendment.

3. The State also argues that if a defendant charged with capital murder is entitled to fif-

teen peremptory challenges at a competency hearing he should also be entitled to examine each prospective juror on voir dire examination at the competency hearing one at a time separate and apart from the other veniremen, and that such procedure would undoubtedly prolong the disposition of a capital murder case.

but they were not even asked whether in their opinion he was competent or not. The appellant notes that the testimony of the State's lay witnesses was contrary to his medical testimony, but contends his witnesses had a better opportunity to observe him than the lay witnesses for the State.

What appellant is asking this court to do is to consider all the evidence—that which supports the verdict and that which does not—and to set aside the verdict if we conclude that it is so against the weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, regardless of whether there is evidence of probative force to support it. This is the standard of review requested.

Although appellant does not brief this ground of error along these lines, he is apparently asking this court to consider this ground as a fact issue question[4] rather than as a law issue question. This court has no jurisdiction to do what the appellant requests as would a Court of Civil Appeals because of a somewhat peculiar constitutional provision applicable to Courts of Civil Appeals. Article V, § 6 (Courts of Civil Appeals), states in part:

"Provided, that the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error. . . ." See also Article 1820, V.A.C.S., Texas Rules of Civil Procedure 451, 453, 455.

It has been said that a "no evidence" question is a question of law while an "insufficient evidence" question is a question of fact before the Courts of Civil Appeals. Calvert " 'No Evidence' and 'Insufficient Evidence' Points of Law," 38 Tex.L.Rev. 361 (1960); Garwood "The Question of Insufficient Evidence on Appeal," 30 Tex.L. Rev. 801 (1952).

In *Electric Express and Baggage Co. v. Ablon*, 110 Tex. 235, 218 S.W. 1030, 1033 (1920), the Supreme Court of Texas stated:

"Whether there is *any evidence* in support of a finding or verdict of the jury is, purely and simply, a question of law. But, where there is *some evidence* to support a finding or verdict of the jury, the question whether it is sufficient, in the estimation of the trial court or of the Court of Civil Appeals, to support such finding or verdict, is *a question of fact*, and not one of law." (Authorities cited are omitted.)

In *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951), it was written:

"In connection with petitioner's particular contention above-mentioned, the opinion of the court below correctly gives the wording of such contention. It also states that the contention is overruled. However, it further discloses beyond any doubt, that, in purporting to overrule the point, the court actually treated it as a question of law, to wit, that there was *no* evidence to support the verdict, rather than question of fact. The court clearly based its judgment, in so far as the particular assignment is concerned, upon its application to the evidence of the legal proposition stated by it thus: 'If there is any evidence of probative force to support this finding of the jury, such finding is conclusive and binding on both the trial court and this court.' That rule, like the rule whereby the reviewing court looks only to the evidence favorable to the verdict, and the rule of whether reasonable minds could differ, applies, and applies only, to the question of whether the evidence as a matter of law requires a conclusion contrary to the verdict. (Authorities omitted.) Such tests are not applicable to the question under consideration. The latter is one of fact. It is not infrequently described as a question of 'sufficiency' of the evidence. (Authorities omitted.) The question requires the Court of Civil Appeals, in the exercise of its peculiar powers under the constitution and Texas Rules of Civil Procedure Nos.

---

4. In *Gulf, Colorado and Santa Fe Railway Co. v. Latham*, 288 S.W.2d 289 (Civ.App.1956), ref. n. r. e., it was held that a contention that the verdict of the jury is against the overwhelming weight and preponderance of evidence as to be manifestly wrong presents a fact issue and invokes the fact jurisdiction of the Court of Civil Appeals.

451, 453, and 455, to consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether the record contains some 'evidence of probative force' in support of the verdict. See cases cited, supra. The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict."

See also *Gulf, Colorado and Santa Fe Railway Co. v. Abbey*, 313 S.W.2d 108 (Civ.App. 1958), and cases there cited; *Rippeteau v. Rippeteau*, 287 S.W.2d 238 (Civ.App.1956); *Harris v. Interstate Lumber Co.*, 303 S.W.2d 950 (Civ.App.1957); *Purvis v. Morehead*, 304 S.W.2d 221 (Civ.App.1957); *Chantly v. Chrystal*, 274 S.W.2d 765 (Civ.App.1955); *Insurance Co. of North America v. Cangelosi*, 217 S.W.2d 888 (Civ.App.1949); *Missouri-Kansas-Texas R. Co. of Texas v. Webb*, 229 S.W.2d 204 (Civ.App.1950).

Concerning the jurisdiction of a Court of Civil Appeals to consider an insufficient point of error, it has been written:

"An analysis of the evidence in response to an insufficient evidence point of error, or the sustaining of such a point, does not, as is often charged, constitute a substitution by a Court of Civil Appeals of its findings of fact for those found by the jury. In deciding points of this type a Court of Civil Appeals does not find facts; it only 'unfinds' a vital fact. Moreover, action by a court in 'unfinding' a vital fact is not unconstitutional usurpation of the right of trial by jury. The same constitution which guarantees a right of trial by jury empowers Courts of Civil Appeals to decide all fact questions." Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Law," 38 Tex.L.Rev. 361, 368 (1960). See also *Wisdom v. Smith*, 146 Tex. 420, 209 S.W.2d 164 (1948).

In *Electric Express and Baggage Co. v. Ablon*, supra, the Supreme Court of Texas

noted that under the state Constitution the finding on the fact issue by a Court of Civil Appeals was conclusive and binding on the Supreme Court. It is well settled that the Supreme Court has no jurisdiction over points complaining that the finding of the jury was against the weight and preponderance of evidence which are questions of fact over which Courts of Civil Appeals have exclusive jurisdiction. See *Barker v. Coastal Builders*, 153 Tex. 540, 271 S.W.2d 798 (1954); *Bond v. Otis Elevator Co.*, 388 S.W.2d 681 (Tex.1965); *Condra Funeral Home v. Rollin*, 314 S.W.2d 277 (Tex.1958); *City of Ingleside v. Johnson*, 537 S.W.2d 145 (Tex.Civ.App.1976); *Typpett v. Brannon*, 493 S.W.2d 511 (Tex.1973).

After an examination of the constitutional and statutory provisions relating to the jurisdiction of the Court of Criminal Appeals, we conclude that this court has no fact jurisdiction as do the Courts of Civil Appeals, and cannot "unfind" a vital fact finding by a jury. Since we do not have the jurisdiction to pass upon the great weight and preponderance of the evidence, appellant's contention is overruled.

■ Appellant complains that prior to trial on the merits the trial court excused five prospective jurors for the week for "economic reasons" in violation of Article 2120, V.A.C.S., which reads:

"The court may hear any reasonable sworn excuse of a juror, and may release him entirely or until some other day of the term; provided, however, the court shall not excuse any juror for economic reasons unless all parties of record are present and approve such excuse." (Acts 1971, 62nd Leg., p. 2801, ch. 905).

The record reflects that on February 17, 1977 appellant presented a motion regarding the qualification of the jury, which requested, inter alia, that appellant's counsel be present in the central jury room when the jury panel for the week was to be qualified for the weeks of February 28 and March 7, 1977 and be able to object to any of the court's rulings as to any excuses that might be offered by prospective jurors.

It appears by formal bill of exception that when the motion was presented to the trial judge, the Honorable Robert C. Wright of the 137th District Court, on February 17th, he indicated the motion was granted. It was not brought to the attention of Honorable William P. Shaver, Judge of the 140th District Court, until February 23, 1977. At the time Judge Shaver was the judge presiding over the impaneling of the jury panel for the week during the weeks or particular time in question.[5]

At the time the motion was called to Judge Shaver's attention, he notified counsel that he had already personally excused five prospective jurors to a later day in the term. Appellant objected to such action on the grounds the jurors had been excused for economic reasons. The objection was overruled.

The State argues that appellant was not timely in bringing his motion to Judge Shaver's attention. The State also notes that the appellant, who claimed the jurors had been improperly excused, made no effort to attach these prospective jurors. See Article 35.01, V.A.C.C.P. He did file a motion to quash the jury panel, but it was not supported by affidavit as required by Article 35.07, V.A.C.C.P., and a ruling on the same does not show to have been obtained. Error is not presented. See and cf. Ward v. State, 505 S.W.2d 832, 836 (Tex.Cr.App. 1974).

Further, the bill of exception shows that Dr. Robert Carr was excused to a later day in term because jury service at the particular time would cause Dr. Carr to be absent during the Annual Accreditation Conference for St. Mary's of the Plains where he was Chief of Staff. Sam Malouf and James Atchison were excused to a later day in the term because their employers had set their vacations during the week of February 28

and both would lose their vacations if they served. Billy John Chambers was excused until a later day in the term because he was construction superintendent at Texas Instruments, Inc., and the week of February 28 was a critical stage of such construction. Martin Davila, Jr., was excused to a later day in the term because two of the six people employed at the business where he worked were already off the job and his absence for jury service would reduce the work force to one-half.

While the excuses offered by the five prospective jurors were job-related, there is no showing that jury service for any of these individuals would have resulted in the loss of a job, loss of compensation, salaries, wages, etc., the suffering of a financial burden or other economic consequences. We do not conclude that they were excused for economic reasons. No violation of said Article 2120 is shown. Appellant's ground of error is overruled.

■ Appellant also contends the court erred in sustaining the State's challenge for cause to prospective juror Rosie Austin, when she was not disqualified under the test of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The record shows the court first sustained the State's challenge on the basis that Mrs. Austin could not take the mandatory oath required by V.T.C.A., Penal Code, § 12.31(b).[6] After further interrogation, the court sustained the challenge on both the ground that she could not take the aforesaid oath and that the test of *Witherspoon* had been met with regard to her disqualification.

This Court has consistently held that prospective jurors who are unable to affirmatively declare that the mandatory penalty of life or death will not affect their deliber-

---

**5.** It appears Lubbock County uses the system that many counties utilize in having the district judges select a judge to be presiding judge over the central jury panel to be summoned, impaneled, etc., as a jury panel for the week for service in the district and county courts, etc.

**6.** V.T.C.A., Penal Code, § 12.31(b), reads:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

ations on any issue of fact are properly disqualified on that basis alone without the necessity of *Witherspoon* considerations. *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr. App.1977); *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976).

We are aware of the holding in the panel opinion in *Burns v. Estelle*, 592 F.2d 1297 (5th Cir. 1979),[7] which case is now pending rehearing en banc. We, however, adhere to our earlier holdings.

We need not rest our disposition of this question here. Even if the prospective juror was improperly challenged under *Witherspoon*, no error is presented. It has been consistently held that *Witherspoon* has no application where the death penalty is not imposed. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Hinkle v. State*, 442 S.W.2d 728 (Tex.Cr.App.1969); *Parks v. State*, 437 S.W.2d 554 (Tex.Cr.App.1969); *Simmons v. State*, 504 S.W.2d 465 (Tex.Cr.App.1974).

■ Appellant further contends the trial court erred in admitting into evidence his extrajudicial confession. He contends the confession was not voluntary and was the product of incommunicado detention, coercive interrogation in absence of counsel and that he was mentally incapable of making a knowing and intelligent waiver of his rights.

At the separate hearing on the voluntariness of the confession, deputy sheriff Alton Hobbs testified that the appellant was placed in the Lubbock County jail about 5:15 a. m. on Wednesday, January 15, 1975, and that about 8 a. m. he came into contact with the appellant, who was brought to the office of Captain Montgomery for questioning. Hobbs related he gave the *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings[8] to the appellant, and the appellant stated he did not want to make a statement. There was no further interrogation. Appellant was then taken before a Justice of the Peace where bail was set and then he was returned to his cell. Hobbs revealed he had no further contact with the appellant until Friday morning, January 17, 1975, when he was informed by a jailer that a co-defendant, Leroy Green, also a jail inmate and who had already given a statement to the officers, wanted to talk to the appellant.[9] Both Green and the appellant were brought to Captain Montgomery's office where they were permitted to converse. Shortly after this conversation, appellant told the officers he wanted to make a statement. He was then taken to the District Attorney's office where he was given the *Miranda* and Article 38.22, V.A.C.C.P., warnings by the District Attorney. A written statement was then taken from the appellant, who signed the same after initialing each warning to show he understood his rights.[10] Hobbs signed the confession as a witness.

The appellant called G. B. Morris, Guidance Coordinator of the Lubbock Public School System and custodian of the inactive records. Morris related the records showed that Robert White had an I.Q. of 84 as reflected by one test and an I.Q. of 86 as reflected by another test.

Francis Cox, jail captain, identified jail medical records of the appellant made sometime after the confession was given.

---

7. Said panel opinion held that a juror may be disqualified who will not take or cannot comply with the required oath under Texas law [V.T. C.A., Penal Code, § 12.31(b)] not be "affected" in his or her deliberations on an issue of fact by mandatory penalty of death or life imprisonment, upon proper definition of "affected" as meaning "disablingly" or "insurmountably" affected, but a juror who would be affected in the sense of wishing to be very sure of guilt, to be thoroughly convinced, before finding facts in such a way that the death penalty might result is not properly disqualified, and if statute pro- vided for disqualification in such circumstances, it would be impermissibly broad.

8. See also Article 38.22, V.A.C.C.P.

9. There was other testimony that both Green and appellant requested the meeting.

10. The *Miranda* warnings were set out in separate paragraphs on the face of the confession, i. e., "I have the right to remain silent." According to Hobbs, the appellant initialed each paragraph separately to show he understood the particular warning involved.

The records reflected that a clinical psychologist tested appellant on July 12, 1975 and found his full scale I.Q. to be 75, placing him within the range of a borderline mentally retarded classification. The report also indicated the appellant quit school in the fifth grade but later obtained the equivalent of a high school diploma.

Chief deputy sheriff Albert Smith was called by the appellant and testified that the jail records showed from January 15th through January 17, 1975, appellant was in a one-man cell in a cell block on the fifth floor of the Lubbock County jail. He stated that appellant could not have effectively communicated with the "outside world" and would have only been able to communicate with officers or others who came to his cell. He related inmates often communicated with each other by hollering. He acknowledged that co-defendants Sanders and Green were in different parts of the jail than appellant and that it was common practice to keep co-defendants separated while an investigation is ongoing.

The appellant testified the officers, including Hobbs, talked to him twice Wednesday morning, January 15, before he was taken before a Justice of the Peace. He stated that Hobbs and Texas Ranger Horger talked to him again on Wednesday night, Thursday morning and Thursday night, and that he was told Green and Sanders had confessed, and that on Thursday night Sanders was brought to him and told him that he (Sanders) had gotten "his business straight" and appellant should do likewise. Appellant related he had been held in a one-man cell in a cell block that did not contain any other inmates, but that after the confession was given he was moved to another area where there were other inmates.

On cross-examination, appellant admitted he had previously been convicted in federal court of giving false information under the Federal Gun Control Act, and that he had also been convicted of burglary and had been out of the penitentiary about six weeks when the alleged offense occurred.

The appellant also re-offered the testimony of the defense witnesses at the competency hearing. The trial court in its findings (see Article 38.22, V.A.C.C.P.) found the appellant had been properly warned and had intelligently, knowingly and voluntarily waived his rights and made the confession, that he was not coerced into making the statement by any force, threats, persuasion or promises or any improper influence, etc. The court further found the appellant had the mental capacity to understand the warnings given and to affirmatively waive his rights.

We reject appellant's contention the confession was the product of incommunicado detention. There was no showing that appellant attempted to contact a lawyer, his family or others by telephone or otherwise and was not permitted to do so. Further, there was no showing that any would-be visitor was denied access to the appellant. The mere fact the appellant was placed in a one-man cell in a cell block without other inmates with whom he could converse at will is not the type of detention as claimed by the appellant.

As to his contention that there was coercive interrogation in absence of counsel, the record shows that after appellant was given his *Miranda* warnings on Wednesday morning he exercised his right to silence and no interrogation took place. According to Hobbs, he had no further contact with the appellant until Friday morning when appellant stated he wanted to make a statement after talking to Green. He was taken to the District Attorney, who again gave him the *Miranda* warnings, and he then waived his rights, including his right to counsel. Following interrogation, the confession was taken. This was the only interrogation shown by the State's evidence. Appellant apparently relies on his own testimony that he was brought down from his cell on Wednesday night and that Hobbs and Horger were "just running the story down," relating what they thought occurred. This was repeated on Thursday morning by the same officers, according to the appellant, and on Thursday night, co-de-

fendant Sanders was brought in to tell him to get his "business straight." Deputy Hobbs denied having seen the appellant from Wednesday morning until Friday morning and denied, in effect, most of appellant's testimony. Thus, a sharp conflict in the testimony was presented. It is well settled that at a hearing on the voluntariness of the confession the trial judge is the trier of the facts, the credibility of the witnesses and the weight to be given to their testimony. *Myre v. State*, 545 S.W.2d 820 (Tex.Cr.App.1977); *Aranda v. State*, 506 S.W.2d 221 (Tex.Cr.App.1974), and cases there cited.

With regard to appellant's claim that he was mentally incapable of making a knowing and intelligent waiver of his rights, we observe the record shows the appellant to have been twenty-six years old, who had obtained the equivalent of a high school diploma though he left school in the fifth grade, who had prior convictions and prior experience with law enforcement officials, and who when first warned of his rights exercised his right to silence and who later called attention to the fact the pages of his written confession were mis-numbered. It is further noted that when he testified at the hearing on the voluntariness of the confession, his testimony was lucid and he had no difficulty with the interrogation. Further, a jury which heard both medical and lay testimony found him competent to stand trial.

Appellant relies upon testimony that various tests showed he had an I.Q. of 75, 84 and 86, placing him within the range of a borderline mentally retarded classification, in the lower three percent of the population in intelligence.

This question was addressed in detail in *Nash v. State*, 477 S.W.2d 557 (Tex.Cr.App. 1972), wherein we concluded:

"Having determined that waiver is permissible, we turn to appellant's contention that the waiver or waivers were not knowingly and voluntarily made. He primarily relies upon evidence of his 'mental and intellectual handicap,' his intelligence quotient of 76, intelligence-emotional level of a 12 year old, a marked tendency to be highly suggestible, easily persuaded and gullible.

"In *Grayson v. State*, 438 S.W.2d 553 (Tex.Cr.App.1969), this court held that whether a defendant had the mental competency or intelligence required to waive his right to remain silent and to have counsel present prior to the giving of a confession was for the court and the jury, and the testimony of psychiatrist and psychologist concerning defendant's IQ, was not conclusive and did not require finding that the State failed to demonstrate intelligent waiver of self-incrimination privilege and right to retained or appointed counsel. Such testimony showed Grayson had an intelligence quotient (IQ) of 51 and was classified as a low grade moron.

"In *Casias v. State*, 452 S.W.2d 483 (Tex.Cr.App.1970), this court said:

"'As in *Grayson v. State*, Tex.Cr. App., 438 S.W.2d 553, it is difficult to see how one accused of a crime may not have sufficient intelligence or mental ability to understand the content of his confession and yet be competent to stand trial, understand the nature of the charge against him and to assist his counsel in preparing a rational defense.'"

We find the evidence sufficient to support the trial court's finding that appellant had the mental capacity to understand the warnings and to affirmatively waive his rights. In view of the totality of the circumstances in the record, we conclude that appellant's confession in the instant case was freely and voluntarily given after he had been fully apprised of his constitutional rights and had affirmatively waived those rights. *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr.App.1978); *McKittrick v. State*, 541 S.W.2d 177 (Tex.Cr.App.1976).

By supplemental brief filed only in this court, appellant now contends his extrajudicial confession was also inadmissible because his right to silence once invoked was not "scrupulously honored." *Miranda v. Arizona*, supra. This contention can only be

considered as unassigned error "in the interest of justice." Article 40.09, § 13, V.A. C.C.P.

■ First, we observe that the admission of the confession was not objected to on the basis now urged on appeal by supplemental brief. Thus, nothing is presented for review.

Even if it can be argued that the contention is properly presented for review, we perceive no error in the admission of the confession.

Appellant relies upon that part of the *Miranda* decision which reads:

"Once warnings have been given, the subsequent procedure is clear . . . If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473–474, 86 S.Ct. at 1627.

In *Michigan v. Mosely*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1973), it was held that the above quoted portion of the *Miranda* opinion or any other part of that opinion could not be sensibly read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent. 96 S.Ct. at 326. In footnote 9 of such opinion (96 S.Ct. at 326), it was noted that a vast majority of federal and state courts

presented with the issue had concluded *Miranda* does not create a per se proscription of any further interrogation once the person being questioned had indicated a desire to remain silent.[11] This is particularly true where the prosecution has sustained its heavy burden of demonstrating that the accused knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. *Gunter v. State*, 421 S.W.2d 657 (Tex.Cr,App.1967); *Hill v. State*, 429 S.W.2d 481 (Tex.Cr.App.1968). See and cf. *Harris v. State*, 516 S.W.2d 931, 936 (Tex.Cr.App.1975) (Concurring Opinion), and cases there cited. Waiver in such cases is more easily determined when the subsequent conversation with the officers is initiated by the defendant followed by a clear-cut waiver of the right of self-incrimination (the right to remain silent). See and cf. *Nash v. State*, 477 S.W.2d 557 (Tex.Cr. App.1972), and cases there cited.

In the instant case, the right to silence invoked on Wednesday morning by the appellant was honored, and according to the State's testimony there was no further interrogation of appellant until Friday morning when he stated to the officers he wanted to give a statement, was again duly warned by the District Attorney in accordance with the *Miranda* decision and waived his rights. Appellant, of course, relies upon his testimony that he was "interrogated" on Wednesday night, and again Thursday morning and night by deputy sheriff Hobbs and Ranger Horger.[12] Hobbs denied he saw or had contact with the appellant from Wednesday morning until Friday morning. Horger was not called as a witness. The facts were not developed as well as they might have been. Here again, the trial judge was the trier of the facts, the judge of the credibility of the witnesses and the weight to be given to their testimony. *Myre v. State*, supra; *Aranda v. State*, supra. The trial judge was not required to believe the appellant's testimony.

11. Numerous authorities were cited including *Hill v. State*, 429 S.W.2d 481 (Tex.Cr.App. 1968).

12. Appellant did not testify he was questioned or interrogated at these sessions, but that these officers kept giving their version of what happened to him and informed him that the codefendants had given written statements. On Thursday night, he claimed they presented codefendant Sanders, who stated he had gotten his business straight and the appellant should do likewise.

Appellant's contention is overruled.

Appellant contends the "evidence is insufficient to support the capital murder conviction . . . because there is insufficient corroborative evidence of an element of the corpus delicti of murder, to wit: the theft element of robbery."

V.T.C.A., Penal Code, § 19.03 (Capital Murder), provides in part:

"(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

"(1) * * *

"(2) the person intentionally commits the murder in the course of committing or . . . attempting to commit . . . robbery, aggravated rape . . .;

"(3) * * *."

V.T.C.A., Penal Code, § 29.02 (Robbery), provides:

"(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this code and with intent to obtain or maintain control of the property, he:

"(1) intentionally, knowingly, or recklessly causes bodily injury to another; or

"(2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death."

V.T.C.A., Penal Code, § 29.01(1), provides:

"In this Chapter

"(1) 'In the course of committing theft' means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft."

Theft as defined at the time of the alleged offense on or about January 12, 1975, is defined in V.T.C.A., Penal Code, § 31.03 (1974).

The indictment, omitting the formal parts, reads that:

". . . in the County and State aforesaid Robert Lee White did then and there intentionally and knowingly cause the death of an individual, Warren Andrew McKay by shooting him with a gun, and the said Robert Lee White, did then and there intentionally cause the death of the said Warren Andrew McKay in the course of committing the offense of Robbery, to wit: while in the course of committing theft and with intent to obtain and exercise control over property of Warren Andrew McKay, to wit: good and lawful United States Currency, without the effective consent of the said Warren Andrew McKay of said property, did then and there intentionally cause bodily injury to Warren Andrew McKay by shooting him with a gun . . . ."

The extrajudicial confession, omitting the warnings, reads as follows:

"On Sunday, January 12, 1975, Raymond Sanders, Leroy Green, and I and my sister and here (sic) two little kids left my mother's house going out to Raymond's place at about 4:00 p. m. or a few minutes after. After we got out to Raymond's place, we filled the truck up with gas. Then, Raymond, Leroy and myself went out to the McKays' house and Mr. McKay came out the door and then Raymond asked him did he know where Mr. Hood lived and where he could find him. Mr. McKay told Raymond that he could probably find him some place. Raymond, Leroy and myself then left. Then we went down to the Coffees' house. This was between 6:30 p. m. and 7:00 p. m. We sat down there awhile, maybe 20 or 30 minutes during the time we were at the house. All three of us went into the house. We went down there because Raymond told me and Leroy that the Coffees tote a lot of money. We went down there to rob the Coffees of their money. Then Raymond, after we got in the house, asked Mr. Coffee about how he used to show him a bunch of $100.00 bills and things. Then Mrs. Coffee says to him when that one night that Mr. Coffee went out and there was somebody that kept following him then and he thought that they were going to try to rob him and that was when he quit toting money on him. Then Raymond made a statement to Mr. Coffee that he used to show

him all those bills and things that made his eyes almost pop out. Then Mrs. Coffee, she told Raymond that he could not do it because now all that they had was some savings bonds and some other kind of securities stuff. Then Leroy seen a picture on the wall of some boy in the Marines. Then he started talking to Mrs. Coffee about that picture. Then Raymond jumped up and told me and Leroy that let's go and told Mr. Coffee that he would check with them later. Then we left their place—Raymond, Leroy and myself, and we went on back down to the McKays' house. The truck was still parked there. We knew that the McKays had company and was having a party. We did not stop. We kept straight going, then we came back by and sat on the road. * * * After we got and Mr. McKay came out of the house with a flash light in his hand and Raymond asked him what happened to the party. Mr. McKay stated that the party was all gone. * * * He [Raymond] had a piece of a jack handle using it for a pistol. Mr. McKay, he thought it was a pistol. Then Raymond explained to Mr. McKay that Leroy and myself, we were out to get some money. Then Raymond told Mr. McKay, he said Mr. KcKay you know me—said you know me real good. The only thing I want you to do is to tell your wife to come on outside and then these boys won't hurt you. Mrs. KcKay she came to the door, then she asked what was going on. Then me, Raymond, and Leroy said come on out ma'am and no one will get hurt. Then Leroy ran into one of the rooms in the house and got the lady's purse. * * * I told Mrs. McKay and Mr. McKay to get in the back of the pickup and lay down. Then Raymond stated to me and Leroy not to worry about a thing because he was used to that kind of stuff. Leroy was on one corner in the back of the pickup and I was in the other corner. Raymond was driving. Then Raymond started speeding on down the dirt road. He drove to where the people were later found. After we got to the place where the people were found, I

had a shotgun in my hand. I pulled the trigger. I was going to shoot one of them, but I don't know which one it was going to be. But I had forgotten to put a shell in the gun. Then after I pulled the trigger it did not do nothing. Then next thing I know, I seen the lady when she fell on the ground. Then Raymond jerked the gun out of my hand there and I seen Mr. McKay running down the road. Then Raymond shot him in the back. Then Mr. McKay fell and then me and Leroy told Raymond, let's go and Raymond said wait a minute, we can't take no chances on this. But I was not aware that Raymond went over again and shot Mr. McKay again in the head, but I do remember Raymond shooting Mr. McKay. I can't say where Raymond shot Mrs. McKay or Leroy shot Mrs. McKay because I was looking down the road to see if anything was coming down the road. I turned around and seen Mrs. McKay when she fell on the ground. That's why I can't say who shot her. Then we jumped in the pickup and Raymond started speeding on back to his home. * * Each one of us got about $65.00 or $70.00. We got most of this money out of Mr. McKay's billfold. Leroy got three or four $1.00 bills out of Mrs. McKay's purse. Leroy took the billfold out of Mr. McKay's back pocket when we was standing up at the house. Raymond took the billfold from Leroy, but I don't know what happened to it after that . . .''

In addition to the confession, the record reveals that investigating officers were able to match tire tracks found at both the Coffee and McKay homes with those found at the site where the bodies were found. These tracks were then positively matched to those on the pickup driven by Sanders. It was through these investigations and match-ups at several locations that the appellant became a suspect and was eventually arrested at his home.

 While the uncorroborated extra-judicial statement of an accused is insufficient to establish the corpus delicti of a

crime, if there is some evidence corroborating a confession, the confession may be used in the establishment of corpus delicti. *Valore v. State*, 545 S.W.2d 477 (Tex.Cr.App. 1977); *Batterbee v. State*, 537 S.W.2d 12 (Tex.Cr.App.1976). Therefore, the threshold question to be resolved in the instant case is whether there was sufficient corroborative evidence which tended to support the content of the confession. In resolving this issue, it must be remembered that corpus delicti may be proved by circumstances as well as by direct evidence. *Fields v. State*, 468 S.W.2d 71 (Tex.Cr.App.1971); *Bridges v. State*, 172 Tex.Cr.R. 655, 362 S.W.2d 336 (1962); *Lyles v. State*, 171 Tex. Cr.R. 468, 351 S.W.2d 886 (1961); *Watson v. State*, 154 Tex.Cr.R. 438, 227 S.W.2d 559 (1950). To this extent, a confession may render sufficient circumstantial evidence that would be insufficient without it. *Watson v. State*, supra; *Pollan v. State*, 247 S.W.2d 889 (Tex.Cr.App.1952).

In the case at bar, the testimony elicited from the State's witnesses reflects that three black males went to the home of Gladys and Benjamin Coffee at approximately 7 p. m. Appellant was identified by both of the Coffees as one of the men. Gladys Coffee testified that one of the men, Sanders, was interested in the fact that her husband sometimes carried $100.00 bills in his pocket. According to her, Sanders made specific mention of this fact in his conversation with the Coffees that evening. Soon after she told Sanders that her husband no longer carried such sums, the trio left. There was testimony that the appellant and his cohorts both arrived and departed the Coffee residence in a pickup truck. Tire tracks matching those on a pickup driven by Sanders were found at both the Coffee and McKay residences as well as at the scene where the McKays' bodies were discovered. The record further reflects that when the body of Andrew McKay was found, his billfold was taken from his hip pocket, where he was known to carry it, and searched. The deputy who searched the wallet found no money whatsoever inside. Moreover, Mrs. McKay's billfold was found outside of her purse, on the floor of the McKay house.

No money was found inside her billfold either. Benjamin Coffee, who also happened to be the brother-in-law of McKay, testified that he had personal knowledge of the fact that McKay was in the habit of always carrying large sums of money in his billfold.

The court charged the jury on the law of parties and criminal responsibility (V.T. C.A., Penal Code, §§ 7.01 and 7.02), on the law of circumstantial evidence, on the issue of the voluntariness of the confession, and in applying the law to the facts required the jurors to find before appellant could be convicted that the alleged offense occurred "in the course of the offense of robbery, to wit: while in the course of committing theft . . . ."

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the evidence is sufficient to sustain each element of the offense. Appellant's contention is overruled.

The judgment is affirmed.

ROBERTS, J., not participating.