IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 88-6108

---

ROBERT WALLACE WEST, JR.,

Petitioner-Appellant,

versus

GARY L. JOHNSON, Director,
Texas Department of Criminal Justice,

Respondent-Appellee.

---

Appeal from the United States District Court for the
Southern District of Texas

---

August 19, 1996

Before POLITZ, Chief Judge, GARWOOD and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

Robert Wallace West, Jr. (West) appeals the district court's denial of his petition under 28 U.S.C. § 2254 challenging his February 1983 Texas conviction and death sentence for the August 1982 intentional murder of Deanna Klaus while in the course of committing or attempting to commit burglary of her motel room, contrary to Texas Penal Code § 19.03(a)(2). We previously granted a certificate of probable cause. We now affirm.

## Procedural Background

West's conviction and sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals, *West v. State*, 720 S.W.2d

511 (Tex. Crim. App. 1986) (en banc), and the United States Supreme Court denied *certiorari*. *West v. Texas*, 107 S.Ct. 2470 (1987). West, represented by new counsel, filed state habeas proceedings. The state trial court, the same judge who had presided at West's 1983 trial, on August 25, 1987, entered findings and conclusions, based on the record and affidavits of West's trial and direct appeal counsel, and recommended that the Court of Criminal Appeals deny all relief. The latter court on August 31, 1987, denied relief in a written order not stating reasons. West, through the same counsel who represented him in the state habeas proceedings, instituted the instant section 2254 proceedings in the district court below. Several months after West's counsel filed his amended petition,[1] the state filed its answer and motion for summary judgment. West never replied to the motion and some ten weeks after it was filed the magistrate judge issued a memorandum opinion recommending that the state's motion be granted. After being granted several extensions, West filed an unverified "response to magistrate's memorandum and recommendation."[2] On review of the

---

[1]The amended habeas petition states that it amends the original petition "by deleting the same in its entirety and substituting in lieu thereof the following." The amended petition asserts that the original petition had been "mistakenly filed." The amended petition is not verified (and is signed only by counsel); it is supported by an affidavit of clinical psychologist Brown concerning his July 1987 examination of West (and of certain records pertaining to him), but by no other affidavit or similar document.

[2]This response was supported only by a copy of West's unverified motion for evidentiary hearing and for funds for expert assistance filed in the state habeas proceedings and by a transcript of certain of West's counsel's oral arguments or statements to the state habeas court on August 25, 1987.

record, the magistrate judge's memorandum, and West's response, the district court entered an order accepting the magistrate judge's memorandum and recommendation, granting the state's motion for summary judgment, and dismissing the petition. West filed a timely notice of appeal.

## Factual Background

The state's evidence showed that the victim, Deanna Klaus, lived alone in room 312 at the Memorial Park Motel in Houston, Texas, and worked as a waitress at the motel's restaurant.

Shortly after midnight on August 24, 1982, Vickie Stolz and two other residents of the motel were sitting in the motel's breezeway and heard a commotion emanating from motel room 312. A fourth companion shortly joined these three. A few minutes later, West was observed exiting room 312; he walked within four to six feet of Stolz and her companions, then turned and walked up a flight of the motel's stairs; the blue jeans he was wearing appeared to be soaked with blood.[3] Stolz and her companions then looked into room 312, which was in total disarray, and observed the nude body of Deanna Klaus, bloody and bound, lying face down on the bed.

Police officers arrived on the scene shortly thereafter, and one of the witnesses directed them to room 447 in the motel on the floor above room 312. Room 447 was occupied by West and a male transvestite companion, Gonzalo Tagle. The police asked both to

---

[3]West was the only person seen to leave room 312; no one was seen to enter.

3

step outside, and West was arrested when he did so.  Tagle advised that the room was his and gave permission to search.  The police observed a pair of wet, bloodstained blue jeans lying over a chair in the room.  Stolz and her companions identified West as the individual they had observed leaving room 312.

Police officers promptly examined room 312.  Detective Lott testified that based on his examination of the door to room 312, in his opinion it had been forced open.  Officer Richardson testified that the door "was separated from the seams as if broken into."  There was other similar testimony.  There was police officer testimony that room 312 "was ransacked," there was "stuff scattered around the floor" and "drawers have been pulled out, dumped on the floor."  Other testimony concerning the room was that there were "items on the floor" and it appeared "like somebody went through everything."

The pathologist testified that Klaus' wrists and ankles were bound by cloth so tightly as to leave visible pressure grooves on her; her mouth and nose were gagged with a towel tied by a cloth binding that likewise left pressure grooves.  Her head was covered by a bloody sheet tied by a leather belt wrapped twice around her neck.  There was a stab wound in her neck and two on her left arm.  A six-inch piece of wood protruded two inches from her back, being stuck four inches into her body.  There was evidence of strangulation by hand, reflected by her broken hyoid bone.  Death resulted from asphyxiation, caused by the belt and cloth ligatures around the neck and mouth as well as by manual strangulation, in

4

combination with the wound from the stick penetrating four inches into her chest cavity.

West, following repeated warnings as called for by *Miranda v. Arizona*, 86 S.Ct. 1602 (1966), gave a full written confession to the police in which he admitted killing Klaus. He said he forced his way into her room, pushing the door open with his shoulder. He disrobed Klaus, tied her up, and gagged her and put a belt around her neck. He thereafter beat her in the face with a "club" he found in the room; it broke, and he stabbed her with it. He hit her with a bottle, which broke, and then "gigged her in the neck with it." Then, "[w]hen I got up she was still making noises, she was still alive. I knew that since I went that far that I couldn't leave her like that. I grabbed the sheet and wrapped it around her neck and I strangled her. I pulled it until she didn't move anymore." West further stated that he took a gold necklace that he saw in her room, and when he returned to room 447 put the necklace in Tagle's purse. West said that when he left room 312 "the door was hard to open because of when I had broke in" and "[t]here were two dudes and a girl outside when I came out and went to my room" and "I had blood all over me."

At the punishment stage of the trial, previously redacted portions of West's confession were admitted in evidence. This portion of the confession reflected that West and Tagle—a "drag queen" female impersonator who used the first name Roxanne—had begun living together in Houston in April 1982. Roxanne had a job, and Roxanne and West "also made money by hustling tricks in the

5

Montrose area of town."  One evening in May they went to the Montrose area "to make money any way we could."  Roxanne attracted a "trick"—whom West stated later turned out to be one William Longfellow whom West understood worked as a security guard—and West asked Roxanne "if she wanted me to roll him and she said yes."  West and Roxanne devised a plan whereby Longfellow would give West, as well as Roxanne, a ride home in Longfellow's car and "I would do the rolling."  In the Montrose area, in front of the Chicken Coop Bar there, Longfellow, at the requests of Roxanne and West, agreed to give West a ride to his apartment, and all three got in the front seat of Longfellow's red Mercury Zephyr and drove to the general vicinity of the apartments on Sage Street where Roxanne and West lived.  Then Longfellow, at Roxanne's request, stopped and let Roxanne out to urinate, and Longfellow followed her.  West followed both of them.  As they walked back to the car, West was behind Longfellow.  West's confession goes on to state:

> ". . . I pulled out my knife and grabbed him by his hair and lifted him up off the ground and I stabbed him in the jugler vain [sic].  I stabbed him about six or seven times.  As I was stabbing him I asked him where his money was.  He told me that his money was in the trunk of his car.  After he told me where his money was at I hit his head up against a tree and left him for dead.  He wasn't moving and he wasn't saying anything and there was a lot of blood and I had blood all over my hands.  I thought he was dead.
>
> As soon as I grabbed the guy and started stabbing him, Roxanne ran from there and ran to the apartments.  The apartments are about two blocks away.  After I stabbed him I got into his car and drove back to the apartments on Sage.  I parked the car behind the WINDSOR PLAZA SHOPPING CENTER.  I opened the trunk of the car and I found the guys money in a brown paper bag.  I got the money and went to the apartment. . . .

6

I thought I had killed the guy so the next morning we checked the newspapers to see if there was a story about him being found. We never seen nothing about the man being found. After a few weeks we just forgot about it. A couple of weeks later ROXANNE called me from the jail and she told me that she had been busted for prostitution. I went to the police station and found out that there was a hold on her for the stabbing. That's when I found out that the man wasn't dead. . . .

Roxanne was in jail for about two weeks and she tried to call me several times but I was never there. . . . When Roxanne got out she told me that she had given Brett's name as her lover and the police let her go. . . .

A couple of weeks after Roxanne got out of jail we drove to McALLEN, TEXAS to her fathers ranch. . . ."

This portion of the confession also reflects that West and Tagle had returned to Houston and checked into the Memorial Park Motel on August 21.[4]

---

[4]There were still other redacted parts of West's confession that were never put before the jury or offered in evidence, by either side at either the guilt-innocence stage or the punishment stage. These portions reflect that while Roxanne was in jail, West and "a friend," Brett Barstow, and Barstow's homosexual lover "Stephanie," stayed at Roxanne's apartment. Roxanne told West "she" had called from the jail and, West being out, spoke to Brett, telling Brett the police were looking for "her" "lover" in connection with the Longfellow stabbing; Roxanne told West that, at Brett's suggestion, Roxanne had given the police Brett's name as "her" "lover." While Roxanne and West were in McAllen, a mutual friend called and advised that Brett had been killed "over drugs"; West did not believe the "over drugs" explanation as he had known Brett since he met him hitchhiking in Kentucky in 1979, and Brett "could get money any time he wanted." When he returned to Houston, West was told by a Montrose area drug dealer that a "drag queen" had told the drug dealer that several weeks previously (which would be about a week before Brett's death) "Longfellow was wanting to put out some money to find out who Roxanne's lover was." West also saw the victim, Deanna Klaus, whom he eventually recognized as someone he had known in Florida, talking to Longfellow; later, another "drag queen"told West that Brett "had been seen all over with" Klaus. West saw Deanna at the motel restaurant the morning of the killing, and stated that he went to her room that night to question her about Brett's death. After tying her up—and having voluntary sex with her [although Klaus' body was found nude, the autopsy revealed no evidence of sexual intercourse]—Klaus

William Longfellow, a private security officer, testified at the punishment phase. His testimony related the May 15, 1982, brutal attack on him by West described in West's confession, including taking Roxanne (Tagle) and West in his red Mercury Zephyr from the Chicken Coop Bar to an area near Sage Street, all three in the front seat, where they stopped so Roxanne could urinate, and West coming up behind Longfellow and knocking him down, slashing his throat with a knife several times. Longfellow told West his money was in a paper sack in the trunk of his car. West hit Longfellow's head several times against a tree stump, wound a roll of white cloth or gauze around his head and mouth several times, and held his head under water in a ditch. He took Longfellow's car keys and driver's license and other identification papers. After West and Tagle left, Longfellow managed to get help. He was taken to a hospital, underwent five and a half hours of surgery, and remained hospitalized for eight days.[5]

eventually admitted to West that she had identified Brett to Longfellow. West stated "I blew up when she said that."

This redacted portion of West's confession also states that Roxanne "knew that I was going down to Deanna's room to kill her. I had told her that I was."

As outlined in the text, *infra*, Longfellow testified at the punishment phase. There is no suggestion anywhere in the record that he knew Deanna Klaus, or Brett Barstow, or had made any attempt to find out who Roxanne's "lover" was.

[5]Longfellow identified Tagle in court as Roxanne, but was not asked to make any identification of West before the jury. Longfellow had bad eyesight. He described his attacker as the male to whom he gave a ride in his car with Roxanne at Roxanne's request, and as being white, "approximately" five foot ten inches tall, and having long brown hair, a description fitting West (who is white and five foot nine inches tall). On *voir dire* by defense counsel, Longfellow had said that he "believed" he saw his assailant in the courtroom, but "I'm not a hundred percent

The state also introduced documentary evidence of West's 1981 Florida conviction for felony grand theft.

West introduced no evidence at the guilt-innocence or punishment stages of the trial. The main thrust of the defense, at trial and on direct appeal, was to attack the admissibility of West's confession, as being the result of a warrantless arrest that was illegal under article 14.04 of the Texas Code of Criminal Procedure,[6] and as having been taken in violation of his *Miranda* rights and his rights under the Fifth and Fourteenth Amendments and analogous provisions of Texas law. The state trial court held a *Jackson v. Denno*, 84 S.Ct. 1774 (1964), hearing out of the jury's presence on the admissibility of the confession and found it admissible, and also instructed the jury not to consider the confession if it were not found to have been given freely and voluntarily after proper warnings.[7]

---

certain." Of course, West's confession—the many details of which so closely matched Longfellow's testimony (e.g., Roxanne, Chicken Coop Bar, red Mercury Zephyr, all three in front seat, etc.)—renders it clear beyond doubt that West was Longfellow's assailant, a matter that at no stage of these proceedings has ever been questioned.

[6]Article 14.04 provides "Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused." On West's direct appeal, two of the Texas Court of Criminal Appeals judges dissented from affirmance, agreeing with West's argument based on article 14.04. *West*, 720 S.W.2d at 520-523. West also contended on direct appeal his arrest was without probable cause.

[7]The defense further contended, at trial and on direct appeal, that the Florida conviction was inadmissible because the "pen pack" by which it was proved did not affirmatively show West (convicted

**Discussion**

We turn now to the issues raised by West on this appeal.

I.   Sufficiency of the Evidence and Related Ineffective Assistance
     of Counsel

West contends that the evidence is insufficient to support his

capital murder conviction.  His argument is that his confession as

to the theft of the necklace was not corroborated, so accordingly

there was no proof of the underlying felony of burglary that made

the murder in question capital murder under Texas Penal Code §

19.03(a)(2).[8]  We reject this contention.

_____

on his "*nolo contendere*" plea) had waived or been informed of his
right to a jury trial, and that certain jurors had been excluded
contrary to *Witherspoon v. Illinois*, 88 S.Ct. 1770 (1968).  It was
further claimed at trial and on direct appeal that the evidence,
particularly if the confession were excluded, did not support the
jury's affirmative answer to the second punishment special issue
concerning future dangerousness.

[8]Section 19.03(a)(2), defining "capital murder," as then in
effect provided:

   "(a) A person commits an offense if he commits murder as
   defined under Section 19.02(a)(1) of this code and:

      (1) . . . ;

      (2) the person intentionally commits the
      murder in the course of committing or
      attempting to commit kidnaping, burglary,
      robbery, aggravated rape, or arson;

      (3) . . . ."

Texas Penal Code § 19.02(a)(1), defining "murder," as then in
effect provided:

   "(a) A person commits an offense if he:

      (1) intentionally or knowingly causes the
      death of an individual;

      (2) . . . ."

10

Habeas relief under section 2254 on a claim of insufficient evidence is appropriate only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 99 S.Ct. 2781, 2791-92 (1979).  Even if we were to accept West's premise that proof of theft was necessary to establish that the murder was committed "in the course of committing or attempting to commit . . . burglary,"[9] it is evident to us that, based on all the circumstances taken together with West's confession, a rational trier of fact could have found theft proved beyond reasonable doubt.  West's confession was amply corroborated, and there was no evidence the theft did not occur.

West relies on the "Corpus Delicti" rule.  However, he cites no authority for the proposition that application of that rule is

---

Texas Penal Code § 30.02(a) as then in effect defined burglary as follows:

"**§ 30.02.  Burglary**

(a) A person commits an offense if, without the effective consent of the owner, he:

(1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony or theft; or

(2) remains concealed, with intent to commit a felony or theft, in a building or habitation; or

(3) enters a building or habitation and commits or attempts to commit a felony or theft."

[9]And, we do not accept that premise, for the reasons stated in the text *infra*.

11

constitutionally mandated in a *Jackson v. Virginia* analysis, particularly as to an underlying felony in a felony murder or capital murder context.[10] In any event, this Court, relying on, among other decisions, *Smith v. United States*, 75 S.Ct. 194 (1954), and *Opper v. United States*, 75 S.Ct. 158 (1954), long ago held that "corroborative evidence need not be sufficient, independent of a confession or admission of an accused, to establish all elements of a crime allegedly committed. Indeed, the Government fulfills its duty when it introduces substantial independent evidence which tends to establish the trustworthiness of an accused's admissions." *United States v. Seckler*, 431 F.2d 642, 643 (5th Cir. 1970). *See also id.* at 644 n.2; *United States v. Abigando*, 439 F.2d 827, 833 (5th Cir. 1971) ("a confession can be corroborated by bolstering parts of it to show trustworthiness. Some elements can be proved by the confession alone"; footnote omitted); *United States v. Gresham*, 585 F.2d 103, 107 (5th Cir. 1978) (same). Here it is plain that West's confession was adequately corroborated—by evidence aliunde the confession—by bolstering parts of it to show its trustworthiness, and that the theft "element" of burglary could be adequately proved by the confession itself. West contends, at

---

[10]For example, several state courts of last resort have held that in a felony murder prosecution, the *corpus delicti* rule does not require that there be corroboration (apart from the confession) of the portions of the confession establishing the predicate felony. *See, e.g., Gentry v. State*, 416 So.2d 650, 652-53 (Miss. 1982); *People v. Daley*, 47 N.Y.2d 916, 393 N.E.2d 479 (N.Y. 1979); *People v. Davis*, 46 N.Y.2d 780, 386 N.E.2d 823 (N.Y. 1978); *Harrison v. State*, 269 Ind. 677, 382 N.E.2d 920, 924-925 (Ind. 1978); *People v. Cantrell*, 8 Cal.3d 672, 504 P.2d 1256, 1261-1262 (Cal. 1973).

12

least implicitly, that the corroboration rule in Texas is otherwise. However, as we held in *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir.), *cert. denied*, 111 S.Ct. 265 (1990), "in challenges to state convictions under 28 U.S.C. § 2254, only *Jackson [v. Virginia]* need be satisfied, even if state law would impose a more demanding standard of proof." Accord *Pemberton v. Collins*, 991 F.2d 1218, 1227 (5th Cir. 1993); *Jones v. Butler*, 864 F.2d 348, 361 (5th Cir. 1988), *cert. denied*, 109 S.Ct. 2090 (1989); *Llewellyn v. Stynchombe*, 609 F.2d 194, 196 (5th Cir. 1980). *See also White v. Estelle*, 669 F.2d 973, 978-79 (5th Cir. 1982).

West also claims ineffective assistance of counsel on the basis, *inter alia*, of counsel's failure to raise the issue of alleged evidential insufficiency on direct appeal. For this purpose, the applicable state law standard *is* relevant. *See Summit v. Blackburn*, 795 F.2d 1237, 1244-45 (5th Cir. 1986).

We accordingly turn to Texas law. The most relevant authority at the time of West's trial and appeal was reviewed in *Wooldridge v. State*, 653 S.W.2d 811 (Tex. Crim. App. 1983), where the Court of Criminal Appeals affirmed a conviction for capital murder committed in the course of aggravated rape. Apart from the appellant's confession, there was no evidence that the victim had been sexually molested, although there was ample corroboration of other parts of the confession. In rejecting appellant's corpus delicti argument, the Court of Criminal Appeals wrote:

> "It is well settled that if there is some evidence corroborative of a confession, the confession may be used to establish the 'corpus delecti [sic].' *White v. State,* 591 S.W.2d 851 (Tex. Cr. App. 1979); *Thomas v. State*, 108

13

Tex. Cr. R. 131, 299 S.W. 408 (Tex. Cr. App. 1927). <u>In</u> <u>White, supra</u>, the appellant admitted he participated in murders which occurred during the course of robbery. <u>No</u> <u>independent evidence established a robbery had been</u> <u>committed. The Court held the confession was</u> <u>sufficiently corroborated by circumstances which</u> <u>coincided with details of the confession</u>.

> In *Thomas*, supra, it was stated:
>
> 'A confession is sufficient, if there be such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction of the defendant's guilt in the minds of the jury beyond a reasonable doubt. Such suppletory evidence need not be conclusive in its character. When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of the accused. <u>Full proof of the body of the crime,</u> <u>the corpus delecti [sic], independently of the</u> <u>confession is not required</u> by any of the cases. . . . [citations omitted].'

299 S.W. at 410.

> Viewed in a light most favorable to the verdict, the evidence is ample to support it." *Id*. at 816-817 (emphasis added).

Under *Wooldridge* and *White v. State*, 591 S.W.2d 851 (Tex. Crim. App. 1979), it is clear that the evidence of theft here is sufficient.[11] Accordingly, the failure to argue the sufficiency of the evidence in this respect was not prejudicial and did not amount to constitutionally defective performance by counsel.

Several years after West's conviction was affirmed, the Court of Criminal Appeals handed down *Gribble v. State*, 808 S.W.2d 65

---

[11]*Cf. Anderson v. State*, 717 S.W.2d 622, 631 (Tex. Crim. App. 1986) ("the testimony of an accomplice witness in a capital murder need not be corroborated on the element which elevated the murder to capital murder").

(Tex. Crim. App. 1990), *cert. denied*, 111 S.Ct. 2856 (1991).  The Court held the appellant was properly convicted for capital murder under § 19.03(a)(2) by murdering the victim in the course of kidnaping her, and *rejected* his twelfth point of error contending that the evidence was insufficient because, apart from his confession, there was insufficient evidence the victim had been kidnaped.  *Id.* at 69-74 (the Court held, however, that a *Penry v. Lynaugh*, 109 S.Ct. 2934 (1989) error at the punishment stage mandated reversal of the conviction and sentence, *id.* at 75-76). There was no majority opinion. The opinion announcing the result in *Gribble* was written by Judge Teague and concurred in by two other judges.[12]  Although Judge Teague's *Gribble* opinion states that "evidence independent of appellant's confession was required to show that his victim had been kidnaped", *id.* at 71 (emphasis omitted), it goes on to say that "[s]o long as there is some evidence which renders the *corpus delicti* more probable than it would be without the evidence, we believe that the essential purposes of the rule have been served", *id.* at 72 [citing *Woolridge* and *White*], and "the evidence required for corroboration of an extrajudicial confession need only render the *corpus delicti* more probable than it would be without the evidence", *id.* at 73 (emphasis omitted).  For this limited purpose, "circumstances . . . ambiguous in some respects and far from adequate to support the

---

[12]Three judges dissented without opinion; one judge concurred in the result without opinion; the remaining two judges stated, without elaboration, that "in the treatment of appellant's point of error # 12, they concur in the result only".  *Id.* at 76.

15

conclusions they imply" provided the requisite corroboration. *Id*. These aspects of Jude Teague's *Gribble* opinion were confirmed in *Emery v. State*, 881 S.W.2d 702 (Tex. Crim. App. 1994), where the court sustained a conviction for capital murder committed in the course of a burglary, rejecting the contention that there was insufficient evidence aliunde the appellant's confession to show there had been a burglary.  In *Emery* there was "no sign of a forced entry or of anything missing from the apartment" the victim shared with a roommate and where her body, with its multiple stab wounds, was found.  *Id*. at 704.  In support of its affirmance, *Emery* noted that evidence aliunde the confession "need not be sufficient by itself to prove the [predicate] offense; it need only be 'some evidence which renders the *corpus delicti* more probable than it would be without the evidence.'"  *Id*. at 705 (quoting *Gribble*).

Under this *Gribble-Emery* test there is sufficient corroboration here:  the evidence of forced entry in the middle of the night into a single woman's room which was then ransacked, with drawers pulled out and dumped on the floor, appearing as if somebody went through everything, certainly makes theft more probable than it would be without such evidence.[13]

Since the *Gribble-Emery* test was met in respect to theft,

---

[13]We note that Texas courts have long been willing to infer burglary from circumstantial evidence of forced night time entry into another's habitation.  *See Alvarado v. State*, 596 S.W.2d 904, 906 (Tex. Crim. App. 1980)(evidence showing only that defendant forcibly entered another's habitation at night supports burglary conviction).  *See also*, *e.g.*, *Ellis v. State,* 726 S.W.2d 39, 40-41 (Tex. Crim. App. 1986); *Mauldin v. State*, 628 S.W.2d 793, 795 (Tex. Crim. App. 1982); *Garcia v. State*, 502 S.W.2d 718 (Tex. Crim. App. 1973).

16

counsel's failure to argue insufficiency of the evidence on appeal was neither defective performance nor prejudicial. But, even were the evidence insufficient in this respect under *Gribble-Emery*, we could not find that failure to raise that issue constituted defective performance, given that the evidence was clearly sufficient under the then current Texas case law exemplified by *White v. Scott* and *Woolridge*. Counsel was not bound to foresee *Gribble*, much less *Emery*. Counsel is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant). *Jones v. Barnes*, 103 S.Ct. 3308, 3313-14 (1983); *Smith v. Murray*, 106 S.Ct. 2661, 2667 (1986); *Mayo v. Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989), *modified on other gr'ds*, 893 F.2d 683 (5th Cir. 1990); *Wicker v. McCotter*, 783 F.2d 487, 497 (5th Cir.), *cert. denied*, 106 S.Ct. 3310 (1986). Nor is counsel obligated to anticipate changes in state appellate court rulings. *Smith v. Murray*, 106 S.Ct. at 2667. Review of the record and of counsel's Court of Criminal Appeals brief demonstrate a sound grasp of the case and reflect wholly competent and adequate representation.[14]

---

[14]We again observe that the Court of Criminal Appeals' affirmance was over three dissents, one without opinion and two on the basis of counsel's arguments concerning article 14.04. Appellate counsel's affidavit, which in these respects has never been controverted, explains that in preparing the brief he reviewed and outlined the entire record and he specifically reviewed the evidence with respect to whether or not West's confession was sufficiently corroborated by other evidence and concluded that it was both as to his commission of the murder and of the underlying offense of burglary, mentioning the evidence in detail, including "the evidence showed that the entry occurred at night (Texas law permits an inference of intent to commit theft in a nonconsensual night time entry into a habitation), the apartment was described as

17

Our discussion of the sufficiency of the evidence—and of the related ineffective assistance of appellate counsel claim—has thus far proceeded on the *arguendo* assumption that proof of theft was necessary for proof of burglary and hence for capital murder. Actually, that is not so. Under section 30.02 of the Texas Penal Code burglary includes nonconsensual entry of a habitation *either* "with intent to commit *a felony or* theft," *or* if the accused after such entry "*commits or attempts* to commit *a felony or* theft" (emphasis added). See note 8, *supra*. Here, not only theft, but attempted theft and also entry with intent to commit theft, would have been burglary. Moreover, burglary would be made out by murder after the nonconsensual entry, as indisputably occurred here. The indictment here charged that West did "while in the course of committing and attempting to commit burglary of a habitation owned by DEANN KLAUS, intentionally cause the death of DEANN KLAUS" by

---

being in disarray, and drawers had been pulled out and dumped on the floor," "it appeared . . . that some one had 'went through everything,'" and testimony as to the condition of the door indicated forced entry. Having so concluded, he decided not to raise any issue in that respect, as he felt it would not be successful and "would detract from the potential merit of some of the other issues I chose to raise on appeal"; some of which, "in particular the issues attacking the admissibility of the confession" he felt "had significant merit and might well result in reversal" and accordingly he deemed "that it was advisable not to clutter the brief" with nonmeritorious arguments "which might obscure the issues in the brief which actually had merit." There is no reason not to credit this uncontroverted explanation.

We further note that counsel had been in practice more than ten years, had been an assistant district attorney for nine years, three of which as Chief of the Appellate Division of the Harris County District Attorney's Office, and had personally prepared or supervised preparation of the appellate brief "in dozens of capital murder trials." He was assisted on appeal by lead trial counsel.

18

hitting, stabbing and strangling her.[15]  The jury instructions here likewise allowed a finding of burglary on any of the theories authorized by section 30.02, including the commission of murder after unlawful entry into the room.[16]  The Texas Court of Criminal

[15]West argues that the indictment is void under Texas law because it does not allege the particular elements of burglary, but simply alleges "burglary of a habitation."  He also seems to urge that the indictment provides insufficient notice under the Sixth Amendment.

We decline to reverse on either of these claims because neither was ever in any way raised in the district court below. Moreover, even if we addressed these claims we would find them without merit.  Texas law is settled that an indictment under § 19.03(a)(2), see note 8 *supra*, need not allege the particular elements of the underlying felony, but that it suffices to name the felony, i.e. "robbery," "burglary," "arson," *etc.*  See *Beathard v. State*, 767 S.W.2d 423, 431 (indictment not insufficient "because it failed to allege the elements of the burglary which was used to bring this murder under § 19.03 . . . this Court has repeatedly held that an indictment need not allege the constituent elements of the aggravating feature which elevates a murder to capital murder"); *Ramirez v. State*, 815 S.W.2d 636, 640, 642 (Tex. Crim. App. 1991)(murder in the course of burglary); *Trevino v. State*, 815 S.W.2d 592, 619 (Tex. Crim. App. 1991)(murder in the course of rape, robbery, and burglary), *rev'd on other grds, Trevino v. Texas*, 112 S.Ct. 1547 (1992).  Moreover we think the indictment gives ample notice.

[16]The charge included the following:

"                              1.
A person commits the offense of capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit burglary.

2.
So that you may better understand the nature of the offense with which the defendant is charged, I now define certain terms and words.
. . .

'Habitation' means a structure . . . that is adapted for the overnight accommodation of persons, and includes:  each separately secured or occupied portion of the structure . . .
'Building' means, . . .
A person commits 'burglary' if, without the effective consent of the owner, he:  enters a habitation, or a building

19

(or any portion of a building) not then open to the public, with intent to commit a felony or theft; or remains concealed, with intent to commit a felony or theft, in a building or habitation; or enters a building or habitation and commits or attempts to commit a felony or theft.

'Enter' means . . .

'Effective Consent' includes consent by a person legally authorized to act for the owner.  Consent is not effective if: induced by force, threat, or fraud; . . .

'Felony' means an offense so designated by law or punishable by death or confinement in a penitentiary.

'Attempt' means to commit an act with specific intent to commit an offense where the act committed amounts to more than mere preparation that tends but fails to effect the commission of the offense intended.

A person commits 'theft' if he unlawfully appropriates property with the intent to deprive the owner of the property. Appropriation of property is unlawful if:  it is without the owner's effective consent . . .

'Owner' means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor.

'Appropriate' means . . . to acquire or otherwise exercise control over property . . .

'Property' means: . . .

'Deprive' means: . . .

'Possession' means . . .

A person commits the offense of murder if he intentionally causes the death of an individual.

3.

Now therefore, if you find from the evidence beyond a reasonable doubt that the Defendant, Robert Wallace West, Jr. on or about August 24, 1982, in Harris County, Texas, did while in the course of committing or attempting to commit burglary of a habitation owned by Deanna Klaus, intentionally cause the death of Deanna Klaus by strangling Deanna Klaus with his hands, or by strangling Deanna Klaus with a belt, or by strangling Deanna Klaus with a sheet, or by suffocating Deanna Klaus with a hand towel, or by stabbing Deanna Klaus with a piece of wood, you will find the defendant guilty of capital murder.

If you do not so believe, or if you have a reasonable doubt thereof, you will find the defendant not guilty of capital murder"

In the next paragraph ("4") of the charge, the court instructed on the lesser included offense of murder.

There was no objection to the charge on the ground that it

20

Appeals has several times upheld capital murder convictions on the basis of a burglary where the burglary was established by the murder of the victim following unlawful entry into his or her habitation. *Fearance v. State*, 771 S.W.2d 486, 492-494 (Tex. Crim. App. 1988), *cert. denied*, 109 S.Ct. 3266 (1989); *Beathard v. State*, 767 S.W.2d 423, 427 & n.6, 431 (Tex. Crim. App. 1989)(under general burglary allegation); *Matamoros v. State*, 901 S.W.2d 470, 473, 474 (Tex. Crim. App. 1995)(under general burglary allegation). The evidence here is plainly sufficient to show burglary by West's forced entry into the victim's room followed by his murder of her therein.[17]   Accordingly, for this reason also, West's claim of

_____

allowed burglary (or attempted burglary) to be found on a basis other than committing theft after entry (or on the ground that it did not require the jury to be unanimous as to which particular method of committing burglary was proved), *cf. Schad v. Arizona*, 111 S.Ct. 2491 (1991); *Griffin v. United States*, 112 S.Ct. 466 (1991), or on the ground that any of the methods of committing burglary as mentioned in the charge were not adequately defined or explained.  Nor was any such complaint respecting the charge ever raised at any time in the state courts or in the district court below.  Accordingly, any such complaints made for the first time on this appeal will not be considered.

[17]West argues that using the murder to establish an element of the burglary would render his capital sentence invalid because section 19.03(a)(2) would not then adequately narrow the class of murders eligible for the death penalty.  This particular contention, however, was not raised below (or in the state courts) and hence does not afford a basis for reversal.  Even if we were to reach it, however, we could not sustain it, as we have held that the identical claim of John Fearance, Jr., whose conviction became final well after West's conviction became final, *see Fearance v. State*, 771 S.W.2d 486 (Tex. Crim. App. 1988), *cert. denied*, 109 S.Ct. 3266 (1989), was barred by *Teague v. Lane*, 109 S.Ct. 1060 (1989), because not all reasonable jurists would then have deemed themselves compelled to accept that claim. *Fearance v. Scott*, No. 94-10686 (5th Circuit, March 21, 1995) (unpublished).  Moreover, this same contention was presented to and rejected by the Court of Criminal Appeals in *Fearance v. State*, *supra*.  We also note that the "Practice Commentary" to the 1973 Texas Penal Code by Searcy

21

insufficiency of the evidence and his related claim of ineffective

assistance of counsel for failure to argue otherwise are both

without merit.[18]

---

and Patterson—a work published in Vernon's Annotated Texas Penal
Code with the 1973 Penal Code volumes and frequently cited by the
Texas Court of Criminal Appeals (*see, e.g., Hogue v. State*, 711
S.W.2d 9, 13 (Tex. Crim. App. 1986), *cert. denied*, 107 S.Ct. 329
(1986))—observes concerning section 30.02:  "A separate burglary
offense, however, does perform an important criminological function
in addition to its trespassory and attempt functions:  it protects
against intrusion in places where people, because of the special
nature of the place, expect to be free from intrusion.  The
provision of this protection is the rationale underlying Section
30.02."  Certainly this "important criminological function" would
appear to rationally justify special treatment for murders
committed in the course of such a nonconsensual intrusion into
another's habitation. *See also Lowenfield v. Phelps*, 108 S.Ct. 546
(1988); *Perry v. Lockhart*, 871 F.2d 1384 (8th Cir.), *cert. denied*,
493 U.S. 959 (1989).  And, further narrowing is provided by the
sentencing special issues.

   [18]The state argues, as it did below (and in the state habeas
proceeding), that West's claim of insufficiency of the evidence is
barred under the procedural default doctrine by his failure to
raise it on direct appeal.  The state habeas trial court expressly
found procedural bar on this basis.  Although the Court of Criminal
Appeal's denial of habeas relief stated no reasons, that court, as
we have held, has long held that the sufficiency of the evidence
may only be raised on direct appeal, and may not be raised in state
habeas. *See Clark v. Texas*, 788 F.2d 309, 310 (5th Cir. 1986); *Ex
parte McWilliams*, 634 S.W.2d 815, 818 (Tex. Crim. App. 1982); *Ex
parte Easter*, 615 S.W.2d 719, 721 (Tex. Crim. App. 1981); *Ex parte
Smith*, 571 S.W.2d 22, 23 (Tex. Crim. App. 1978).  In these
circumstances, reliance on the procedural default is adequately
established. *See Ylst v. Nunnemaker*, 111 S.Ct. 2590, 2594-96
(1991); *Teague v. Lane*, 109 S.Ct. 1080, 1068-69 (1989); *Young v.
Herring*, 938 F.2d 543, 549 n.6 (5th Cir. 1991); *Preston v. Maggio*,
705 F.2d 113, 116 (5th Cir. 1983).  Of course, the procedural
default does not bar the related ineffective assistance of counsel
claim and constitutionally ineffective assistance generally
constitutes "cause" for a default; but, we have held that counsel
was not defective (and that there was no prejudice).  As to "actual
innocence" and "innocent of the death penalty" exceptions to the
bar, we hold that they are inapplicable because the evidence
clearly shows that West was guilty of entry without consent into
the victim's habitation and of then murdering her there.  Thus, the
procedural bar is yet another reason to deny West's claim that the
evidence was insufficient.

22

II. <u>Brady and Related Ineffective Assistance of Counsel</u>

West argues that the prosecution suppressed evidence that his confession that he stole a necklace from Klaus' room was fabricated and thus violated his rights under *Brady v. Maryland*, 83 S.Ct. 1194 (1963). Relatedly, West argues, though in only the most conclusory manner, that counsel "failed to undertake reasonable investigation at guilt-innocence and to present evidence indicating that Mr. West was not guilty of the underlying felony of burglary." The only thing in the record even arguably supporting these claims are the conclusory allegations of West's federal and state habeas petitions.[19] We reject these contentions.

*Brady* proscribes "the suppression by the prosecution of evidence favorable to an accused." *Id.* at 1196. Certainly West

---

[19]West's amended section 2254 petition alleges in its paragraph 58B:

> "Counsel failed to investigate, prepare, and present evidence which would have proven that a burglary had not, in fact, taken place. Reasonable investigation would have discovered that West fabricated the theft of the gold necklace and credible, relevant evidence proving the fabrication could have been presented to the jury."

There is absolutely no indication in the petition (or elsewhere in the record) of what the claimed "evidence" is or consisted of or of how it might have been found. There is no allegation that West ever informed his counsel, or anyone else, that he did not take the necklace.

Paragraph 59A of this petition alleges, "The prosecution failed to divulge *Brady* material to the defense including evidence which indicated that the burglary did not, in fact, happen in violation of Robert West's . . . rights." Again, there is absolutely no indication in the petition (or elsewhere in the record) of what the claimed "evidence" is or consisted of; nor is there any allegation or indication of record that West ever informed the prosecution or the police, or anyone else, that he did not take the necklace, or that the prosecution or the police were aware that he did not or of evidence indicating that he did not.

23

knew whether or not he had taken the necklace, and necessarily knew that better than the prosecution could have. As we said in *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994): "*Brady* claims involve 'the discovery, after trial of information which had been known to the prosecution but unknown to the defense.' *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)." And, in *Lawrence* we also quoted with approval the following passage from *United States v. Jackson*, 6 F.3d 911, 918 (2d Cir. 1993): "Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Lawrence* at 257 (citation and internal quotation marks omitted). *See also*, *e.g.*, *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 959 (1995)("A *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information"); *Blackmon v. Scott*, 22 F.3d 560, 564-65 (5th Cir.), *cert. denied*, 115 S.Ct. 671 (1994)("The state is not required to furnish a defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence"); *Duff-Smith v. Collins*, 973 F.2d 1175, 1181 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 1958 (1993); *May v. Collins*, 904 F.2d 228, 231 (5th Cir. 1990), *cert. denied*, 111 S.Ct. 770 (1991); *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990), *cert. denied*, 111 S.Ct. 561 (1990). Moreover, West cites no authority, and we have found none, supporting the conclusion that a *Brady* violation could be found in these circumstances.

24

Accordingly, West would have to extend *Brady* beyond what is compelled by existing precedent, and relief is hence barred by *Teague v. Lane*, 109 S.Ct. 1060 (1989).

Moreover, as the magistrate judge correctly observed in recommending that the state's unopposed motion for summary judgment be granted, "[t]here is no evidence that the prosecution had any evidence relating to the fact that a burglary [by theft] never occurred."[20] The allegations of West's amended section 2254 petition are wholly conclusory in this respect and do not assert that West ever informed (or even suggested to) anyone that he did not take the necklace. See note 19, *supra*. Such allegations do not suffice to entitle West to an evidentiary hearing. "The [habeas] petitioner must set forth specific allegations of fact, not mere conclusory allegations," *Johnson v. Scott*, 68 F.3d 106, 112 (5th Cir. 1995), and "[t]he court need not blindly accept speculative and inconcrete claims as the basis upon which to order a hearing," *Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir.), *cert. denied*, 110 S.Ct. 419 (1989)(internal quotation marks omitted). "Conclusory allegations are not enough to warrant discovery under Rule 6 of the Federal Rules Governing Section 2254 Petitions; the petitioner must set forth specific allegations of fact; Rule 6,

---

[20]Nor was any such evidence provided in West's unsworn objections to the magistrate judge's report; nor did the objections provide any specificity in this respect. Indeed, the objections make plain that what West wants is discovery as to *whether* the prosecution had such evidence, and these objections allege that West "continues to be prejudiced by the prosecutor's intentional conduct *or failure to investigate*" in this respect (emphasis added).

which permits the district court to order discovery on good cause shown, does not authorize fishing expeditions." *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1257 (1995).[21]

West's claim of ineffective assistance of counsel in this respect fails for similar reasons. It, too, is wholly conclusory. West's confession states that he took the necklace, and he has never alleged that he ever informed his counsel that he had not done so, or ever gave counsel any reason to so believe (nor does West's petition allege any facts that would have put counsel on notice under these circumstances, or specify any particular evidence that investigation in this respect would have revealed).[22] There is simply no basis on which to conclude that counsel's performance was constitutionally deficient in this respect. "We

_____

[21]We also observe that at the end of the guilt-innocence stage the prosecutor testified under oath, outside of the presence of the jury, that he had furnished defense counsel all information requested in counsel's numerous and broad discovery motions and that defense counsel had been afforded full access to the prosecution's file. There was no contrary evidence or claim. Also, at a pretrial hearing defense counsel acknowledged he had been given access to the prosecutor's file, including information and an offense report respecting the assault on Longfellow and, apparently, two statements by Tagle.

[22]West's trial counsel's affidavit, which is uncontradicted, states that in the course of his preparation he and his associate counsel "visited with Mr. West on numerous occasions," reviewed the state's file "in its entirety," and retained an investigator. The record reflects that counsel filed and pursued, among many other motions, motions for "Discovery and Inspection," for "Production and Inspection of Evidence and Information Which May Lead to Evidence," and to "Discover any Concessions or Agreements with Third Parties," all of which motions were granted by the trial court, which ordered, *inter alia*, that any and all exculpatory material be promptly turned over to the defense. Defense counsel had full access to the prosecution file (see note 21, *supra*).

must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy," *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 3035 (1993), and "[w]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless . . . counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* (quoting *Burger v. Kemp*, 107 S.Ct. 3114, 3126 (1987) [quoting *Strickland v. Washington*, 104 S.Ct. 2052, 2066 (1984)]; internal quotation marks omitted). West's petition simply does not allege facts showing that counsel's performance in this respect was constitutionally deficient.

Finally, we note that neither the *Brady* claim concerning the theft[23] nor the related ineffective assistance of counsel claim demonstrate the requisite "'reasonable probability' of a different result" such as "'undermines confidence in the result'" under *Kyles v. Whitley*, 115 S.Ct. 1555, 1566 (1995), and *Strickland v. Washington*, 104 S.Ct. 2052, 2068 (1984). The entire claimed importance of the necklace theft is based on the theory that without it there could be no burglary and hence no capital murder. As demonstrated above, this is simply not so. It is uncontested and beyond dispute that West forced his way into Klaus' motel room where Klaus lived and then and there murdered her. This constitutes burglary and establishes West's guilt of capital

---

[23]Other purported *Brady* claims were asserted below but have not been raised on this appeal. They are hence abandoned.

27

murder.

We reject the *Brady* claim and related claim of ineffective assistance of counsel.

III.  Admissibility of Confession

West argues that the admission in evidence of his written confession violated his rights under the Fifth Amendment in that his *Miranda* right to cut off questioning was not scrupulously honored, relying on *Charles v. Smith*, 894 F.2d 718 (5th Cir. 1990).

The evidence shows that when West was arrested and placed in a patrol car at the motel Officer Rogers read him his *Miranda* rights.[24] He did not appear to be intoxicated or on drugs.  After being read his rights West told Officer Rogers that "he already knew his rights anyway".  West was thereafter taken to the police station about 3:30 A.M. and was there interviewed by detective Kent after Kent had again read West his *Miranda* rights.[25] West advised Kent that he understood those rights.  West did not appear intoxicated or under the influence of drugs.  West talked to Kent about 30 to 45 minutes, and gave no indication that he wished to

---

[24]West was advised:

"You have the right to remain silent and not make any statement at all.  Any statement you make may be used against you, probably will be used against you in your trial.  You have the right to have a lawyer present to advise you prior to and during any questioning.  If you are unable to employ a lawyer you have the right to have a lawyer appointed to advise you prior to and during any questions.  You have the right to terminate the interview at any time."

[25]Kent's reading of the rights was essentially verbatim as earlier read to West by Officer Rogers (note 24, *supra*).

28

exercise or invoke any of the rights read to him, nor did he discuss those rights. Kent made no promises or threats to West, and there was no coercion. At the end of this interview Kent took West to the jail to be booked in. Kent talked to West again from about 9:20 to 10:40 A.M. Kent testified that West was "coherent," "in control of his faculties," and "seemed calm, was responsive to my questions and talked freely." Kent testified that no promises or threats were made and there was no coercion. West did not indicate he wished to invoke any of the rights previously read to him. He was taken back to the jail about 10:40 A.M. About noon that day murder charges were filed. Slightly over thirteen hours later, at about 11:50 P.M. that night, West was again questioned by Kent. Kent read West his rights, and told him he had been charged with murder and could get the death penalty. During the questioning Kent informed West that Tagle had implicated him by saying West had returned to their motel room with his clothes bloody and then washed them off. West responded that "he didn't believe Tagle would say that" and said he wanted to talk with Tagle. Officer Rogers was sent to get Tagle, who Kent mistakenly thought was at the police station. About an hour later Rogers returned without Tagle. Kent at that time, approximately 1:00 A.M. August 25, decided to terminate the interview with West and take him back to the jail, which had called advising they wanted West back so he could be transferred to the county. Kent so advised West. Up until that time, West in all discussions with Kent had denied any involvement in the murder. Kent testified "I was

29

getting ready to put him in jail.  He decided to start telling me the story."  West was not intoxicated, he "was alert," and he "talked freely" and was "responsive to" questions.  West never stated he did not want to talk and never asked for a lawyer or otherwise sought to invoke his *Miranda* rights.  No threats or promises were made, and there was no coercion.  After telling his story, West indicated that he would make a written statement.  Kent then again read West the warnings printed on a statement form (identical to those on West's written statement, see note 27, *infra*)and again asked him if he understood them and if he wanted to make a written statement.  West said he understood his rights and would give a written statement.  Kent then proceeded to type on the statement form what West told him.  Kent would from time to time ask questions and type what West said in response.[26]  The statement is seven pages long, Kent was a slow typist, and several coffee breaks were taken.  The entire process took several hours.  When the statement was finished, Kent handed it to West who read it, the first sentence aloud, and made several corrections.  West then read silently the printed warnings, said he understood them, and initialed them.[27]  He then signed each page of the statement.  The

---

[26]Kent testified "If I recall something or another he mentioned in the oral interview that he hadn't related as I was typing, I would ask him about that and he would tell me and I would incorporate that in the statement," using "his [West's] words."

[27]The top of each page of the statement contains the following printed legend (with "Robert Wallace West" and "C. W. Kent" typed in the blanks), just after which the body of the statement is typed, *viz*:

"Statement of <u>Robert Wallace West</u> taken in Harris

entire process was completed at about 7:45 A.M., and West was then returned to the jail.

Summarizing his three separate interviews with West, detective Kent testified there were never any promises or threats made to West, nor any coercion applied. He further testified that on each of these three occasions West had never sought to exercise or raise a question about any of the rights he had been read. Kent also testified: "He never once at all stated that he didn't want to talk to me" or "that he wanted a lawyer," and "he continued to talk with me. He would answer my questions. He would talk freely with me."[28]

---

County, Texas.
    Prior to making this statement I have been warned by C. W. Kent, the person to whom this statement is made, that:

1)    I have the right to remain silent and not make any statement at all and any statement I make may and probably will be used against me at my trial;
2)    Any statement I make may be used as evidence against me in court;
3)    I have the right to have a lawyer present to advise me prior to and during any questioning;
4)    If I am unable to employ a lawyer, I have right to have a lawyer appointed to advise me prior to and during any questioning and;
5)    I have the right to terminate the interview at any time.

    Prior to and during the making of this statement I knowingly, intelligently and voluntarily waive the rights set out above and make the following voluntary statement:"

West initialed each of the above paragraphs 1 through 5.

[28]Kent later repeated this testimony saying, with reference to the three occasions he interviewed West, "he never one time said he did not want to talk to me. No, sir. He never said that," and "he never asked for a lawyer," and "he at no time exercised any of his

31

West did not testify at the *Jackson v. Denno* hearing, and no evidence was presented contradicting the testimony of the police officers called by the prosecution.

The trial court entered detailed written findings that the confession was in all respects voluntary and properly warned. The court found, *inter alia*, that the warnings as testified to were given West, that he never advised the officers that he wanted an attorney present, that "at no time . . . did the defendant request police officers to cease interrogating him," that "defendant, after repeated warnings, knowingly, intelligently and voluntarily waived his rights under Article 38.22, V.A.C.C.P., including his right to assistance of counsel,"[29] and that "the defendant's confession was not the product of force, threats, persuasion, intimidation or promises, but was freely and voluntarily given." On direct appeal, the Court of Criminal Appeals rejected challenges to the confession, holding that the trial court's "findings of fact are

rights" that he had been read.

[29]The rights provided in Texas Code of Criminal Procedure Article 38.22 include all those of *Miranda* and are as follows:

> "(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
> (2) any statement he makes may be used as evidence against him in court;
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
> (5) he has the right to terminate the interview at any time:"

Art. 38.22 sec. 2(a).

32

supported by the record" and "we find ample support for the finding that appellant never requested the interrogation cease." *West*, 720 S.W.2d at 518.

Where the question presented in a section 2254 proceeding is whether a confession admitted at trial was voluntary and in compliance with *Miranda*, with respect to issues of underlying or historic facts, the state court findings, if fairly supported in the record, are conclusive, but there is independent federal determination of the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution. *Miller v. Fenton*, 106 S.Ct. 445, 450-51, 453 (1985).

West challenges the finding of the state courts that he never invoked his right to remain silent, relying on the testimony of detective St. John that between 9:00 and 10:00 A.M. on August 24 West told the officers he "didn't want to tell us anything about it." This testimony is best understood, however, as saying not that West refused to talk or exercised his right to silence, but rather that, denying any involvement in the murder, he refused to talk about what he would only know if he were involved. This construction is consistent with St. John's testimony that during this interview West was "very arrogant in that interview. He was denying his involvement in the episode" and that West never indicated in his presence any desire to invoke the rights of which he had been advised. Moreover, Kent was doing the interviewing, and St. John was in and out of the room. Kent likewise testified

33

that at this interview he discussed the case with West and West "still denied having anything to do with it," but "was responsive to my questions and talked freely." And, as noted, Kent testified that West did not invoke his rights at this meeting, or any other, never said he did not want to talk with Kent, and always "would talk freely with me." The construction West now seeks to place on St. John's testimony would make it contradictory to that of Kent. The record fairly supports the underlying factual determination of the Texas courts that West did not invoke his right to silence.

Even if West had invoked his right to silence at the 9:20-10:00 A.M. interview, this would not render his resumed questioning more than thirteen hours later a failure to scrupulously honor his right to silence. In *Charles v. Smith*, *supra*, the resumed questioning took place "just a few minutes after" the defendant had exercised his right to silence. *Id*. at 726. Similarly, we found a *Miranda* violation where questioning was resumed thirty or forty-five minutes after invocation of the right to silence. *United States v. Hernandez*, 574 F.2d 1362 (5th Cir. 1978). Here, questioning was not resumed until after a lapse of thirteen hours. Thus, the present case is controlled by *Kelly v. Lynaugh*, 862 F.2d 1126 (5th Cir. 1988), *cert. denied*, 109 S.Ct. 3263 (1984), likewise a capital case in which we affirmed a summary judgment denial of habeas relief. There, Kelly, about 11:00 A.M. the day of his arrest, having been advised of his *Miranda* rights, was asked if he wanted to talk, and he responded "no," and was taken to the jail. About 4:00 P.M. the same day, he was taken out of the jail and

34

given his *Miranda* warnings, but he again refused to answer questions, and was returned to the jail.  He was yet again removed from the jail for questioning some four and a half to six hours later (at some time between 8:30 and 10:00 P.M. the same day), and then, after being shown a co-defendant's statement and "without new *Miranda* warnings, Kelly orally confessed.  When the confession was reduced to writing [and signed by Kelly], the *Miranda* warnings were stated at the top of the first page" and were followed by a statement that the signer had read, understood, and voluntarily waived those rights.  *Kelly* at 1130.  Reviewing *Michigan v. Mosley*, 96 S.Ct. 321 (1975), and other relevant authorities, we held that the written confession was admissible, that *Miranda* had been complied with, and "Kelly's right to cut off questioning was scrupulously honored."   *Kelly* at 1130-1131.   Our thorough examination of the record here leads to the same conclusion.[30]  We reject West's contentions to the contrary.

We likewise reject West's claim that the confession was taken in violation of his Sixth Amendment right to counsel.  Although West's Sixth Amendment rights attached when charges were filed, West had never requested (or retained) counsel and none had been appointed for him.  In those circumstances, his waiver of counsel pursuant to his *Miranda* warnings waived his Sixth Amendment right

---

[30]*See also Wilcher v. Hargett*, 978 F.2d 872, 876-77 (5th Cir. 1992); *United States v. Corral-Franco*, 592 F.2d 263, 267 (5th Cir. 1979); *Jackson v. Wyrick*, 730 F.2d 1177, 1180 (8th Cir.), *cert. denied*, 105 S.Ct. 167 (1984); *United States v. Udry*, 748 F.2d 1231 (8th Cir. 1984), *cert. denied*, 105 S.Ct. 3477 (1985).  *Cf. Evans v. McCotter*, 790 F.2d 1232, 1238 (5th Cir.), *cert. denied*, 107 S.Ct. 327 (1986).

not to be interrogated or give a statement without the presence or guidance of counsel. This is made clear by *Patterson v. Illinois*, 108 S.Ct. 2389 (1989), and its progeny. *See United States v. Gayton*, 74 F.3d 545, 555 (5th Cir. 1996) ("As long as the defendant is given *Miranda* warnings, his voluntary decision to answer questions without invoking the right to counsel constitutes waiver [of the Sixth Amendment right]"); *Wilcher v. Hargett*, 978 F.2d 872, 876 (5th Cir. 1992); *Montoya v. Collins*, 955 F.2d 279, 282 (5th Cir.), *cert. denied*, 113 S.Ct. 820 (1992) ("As long as the police administer *Miranda* warnings before proceeding, a defendant's voluntary decision to answer questions without claiming his right to have a lawyer present to advise him constitutes a 'knowing and intelligent,' and therefore valid, waiver of his Sixth Amendment right"; citing *Patterson*).

Finally, West complains of violation of his rights under Tex. Code. Crim. Proc. art. 15.17, requiring that a person arrested be taken before a magistrate "without unnecessary delay." However, asserted violations of state law do not constitute a basis for federal habeas relief. West's written confession was completed approximately thirty hours after his arrest, and there is no showing that he was not taken before a magistrate well before the forty-eight hour presumptive maximum delay of *County of Riverside v. McLaughlin*, 111 S.Ct. 1661 (1991).[31] "Even assuming that the time gap between arrest and initial appearance was unreasonable,

---

[31]West does not argue to us that his arrest was illegal or without probable cause (which was plainly present).

36

the claim does not rise to constitutional significance." *De La Rosa v. State of Texas*, 743 F.2d 299, 303 (5th Cir. 1984), *cert. denied*, 105 S.Ct. 1781 (1985). "The rule in *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) [which] prohibits the use in [federal] criminal cases of confessions . . . where there was a failure to bring the accused before a committing magistrate without unnecessary delay . . . has not been extended to state prosecutions as a requirement of the Fourteenth Amendment." *Smith v. Heard*, 315 F.2d 692, 694 (5th Cir.), *cert. denied*, 84 S.Ct. 154 (1963), citing *Brown v. Allen*, 73 S.Ct. 397 (1953), and *Gallegos v. Nebraska*, 72 S.Ct. 141 (1951). "Failure to [timely] take an accused before a magistrate . . . bear[s] *only* upon the issue of voluntariness" of the confession, and is only one of several factors to be considered in that respect. *Smith v. Heard* at 694 (emphasis added), citing *Colombe v. Connecticut*, 81 S.Ct. 1860 (1961).[32]

---

[32]In *Colombe*, it is stated: "we have not extended its [*McNabb*'s] rule to state prosecutions as a requirement of the Fourteenth Amendment," *id*. at 1878, under which "[t]he ultimate test [of the admissibility of a confession] remains" what it has been "for two hundred years:  the test of voluntariness.  Is the confession the product of an essentially free and unconstrained choice by its maker."  *Id*. at 1879.  Undue delay in taking an accused before a magistrate is merely one of several factors relevant to the ultimate test of voluntariness.  *Id*. at 1878-79.  *See also id*. at 1900.

*Brown* states:  "If the delay in the arraignment of petitioner was greater than that which might be tolerated in a federal criminal proceeding, due process was not violated. . . .  The Court has repeatedly refused to convert this [the *McNabb*]rule of evidence for federal courts into a constitutional limitation on the states . . . .  Mere detention and police examination in private of one in official state custody do not render involuntary the statements or confessions made by the person so detained."  *Id*. at 417.

In *De La Rosa*, relying on *Colombe*; *Brown*; *Gallegos*; and *Smith v. Heard*, we upheld the admissibility of the confession, despite its having been given before the arrested accused was taken to a magistrate and following what we assumed was an unreasonable delay in doing so, because "[i]n our reading of the record we find nothing to indicate that De La Rosa's confession was anything other than the product of his free and voluntary choice." *De La Rosa* at 303.[33] Our review of the entire record here leads to the same conclusion as to West's confession. Notwithstanding the delay between arrest and arraignment, under all the circumstances reflected by the record here, West's confession is shown to be the product of his free and voluntary choice.

We reject all the contentions West raised on appeal in respect to the admissibility of his confession.

IV. *Penry* Claim, and Challenges to Texas Capital Sentencing Scheme

West argues that his rights under *Penry v. Lynaugh*, 109 S.Ct. 2934 (1989), were violated because under the Texas sentencing special issues the jury could not give full effect to the allegedly mitigating circumstances of his case.[34] Insofar as West relies on

---

[33]We also observed that the state trial court "found that De La Rosa confessed of his own free will, unaffected by any threat or coercion." *Id.* at 303.

Read in the context of this entire portion of the *De La Rosa* opinion, and in the light of the authorities there relied on, it is evident that our "causally related" language (*id*. at 303), relied on by West, is merely directed to whether the delay in arraignment caused the confession *to be other than the product of the accused's free and voluntary choice*. Here it did not.

[34]The state argues that a *Penry* claim was not properly raised below. While we are inclined to agree, we need not reach that

allegedly mitigating circumstances not reflected by evidence introduced or tendered at his trial, his claim is without merit as we have repeatedly held that a *Penry* claim may be based only on evidence introduced or offered at trial. *Briddle v. Scott*, 63 F.3d 364, 377 (5th Cir.), *cert. denied*, 116 S.Ct. 687 (1995); *Anderson v. Collins*, 18 F.3d 1208, 1214-15 (5th Cir. 1994); *Allridge v. Scott*, 41 F.3d 213, 223 (5th Cir.), *cert. denied*, 115 S.Ct. 1959 (1995); *Crank v. Collins*, 19 F.3d 172, 176 (5th Cir.), *cert. denied*, 114 S.Ct. 2699 (1994); *Callins v. Collins*, 998 F.2d 269, 275 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1127 (1994). The only evidence actually introduced (or offered, conditionally or otherwise) at trial that West claims is mitigating evidence that could not adequately be taken into account under the sentencing special issue, consists of statements in his confession that he had been drinking heavily the afternoon and evening of the murder and that he "boiled up" or "blew up" at things the victim said to him after he had forced his way into her room and attacked her.[35] As

---

question as we determine West's *Penry* claim is in any event without merit.

[35]The portion of the confession not introduced at either the guilt-innocence stage or the punishment stage (see note 4, *supra*) reflected that this "blow up" resulted from the victim's admission to West (after he had forced his way into her room and assaulted her) that she had identified West's "friend" Barstow to Longfellow as Roxanne's "lover"; West assertedly believed (without any evidence) that Barstow had been killed by Longfellow (or at his direction) because Longfellow (presumably as a result of Roxanne's having told the police Barstow was "her lover") mistakenly thought Barstow (not West) was the person who had assaulted him when he was with Roxanne in May 1982. However, as previously observed, this portion of the confession also states Roxanne "knew that I was going down to Deanna's room to kill her. I had told her that I was."

to the drinking and inference of intoxication, we have many times held that this may be adequately taken into account under both the first and second punishment issues (deliberateness and future dangerousness). *Briddle* at 377; *Anderson* at 1214-15 n.5; *Nethery v. Collins*, 993 F.2d 1154, 1161 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1416 (1994); *James v. Collins*, 987 F.2d 1116, 1121 (5th Cir. 1993); *Cordova v. Collins*, 953 F.2d 167, 170 )(5th Cir.), *cert. denied*, 112 S.Ct. 959 (1992). *See also Lackey v. Scott*, 28 F.3d 486, 487 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 743 (1995). As to West's having "blown up" or the like, any mitigating quality of this evidence could be adequately taken into account under both the punishment issues.[36] *Blackmon* at 564; *Marquez v. Collins* 11 F.3d 1241, 1248 (5th Cir. 1994).

West also makes what appears to be both an as applied and a facial challenge to the Texas sentencing scheme on the basis that it chills counsels' presentation and/or development of mitigating evidence.[37] We have repeatedly rejected such claims. *Briddle* at

---

[36]And this is likewise true as to the fuller "blow up" account given in portions of the confession not introduced at either stage. See notes 4 and 35, *supra*.

[37]We note that in this case, tried in February 1983, years before *Penry* was handed down, defense counsel (not surprisingly) did not request (or object to the absence of) any special instruction of the kind *Penry* indicated would be required in the face of certain kinds of mitigating evidence that might also tend to support an affirmative answer to either of the punishment issues, nor was any evidence offered conditionally on the court's agreeing to give such an instruction. That is not to say, however, that Texas applied a procedural bar (in a case tried before *Penry*) to raising a *Penry* claim on the basis of evidence actually admitted (or offered by the defense but excluded). *See Selvage v. Collins*, 816 S.W.2d 390 (Tex. Crim. App. 1991).

378; *Lackey* at 490; *Crank* at 176; *Black v. Collins*, 962 F.2d 394, 407 (5th Cir.), *cert. denied*, 112 S.Ct. 2983 (1992).

West advances a further facial challenge to the Texas sentencing scheme on the basis that the second special issue improperly functions as an aggravating circumstance and is invalid in the absence of appropriate narrowing definitions or instructions.[38] We rejected essentially the same contention in *James* at 1119-20, and, more recently, in *Woods v. Johnson*, 75 F.2d 1017, 1033-34 (5th Cir. 1996). *See also Nethery* at 1162; *Thompson v. Lynaugh*, 821 F.2d 1054, 1059-60 (5th Cir.), *cert. denied*, 108 S.Ct. 5 (1987); *Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir. 1984), *cert. denied*, 105 S.Ct. 2050 (1985). In *Jurek v. Texas*, 96 S.Ct. 2950 (1926), the facial validity of the Texas capital sentencing scheme was sustained. There the Court held that the constitutionally required narrowing function was performed at the guilt-innocence stage, and further narrowing at the sentencing stage was not required. *Id*. at 2955-57. This was confirmed by *Lowenfield v. Phelps*, 108 S.Ct. 546, 554-555 (1988). *Jurek* likewise expressly rejects the contention that the second punishment issue is impermissibly vague. *Id*. at 2957-58. *See also Pulley v. Harris*, 104 S.Ct. 871, 879 n.10 (1984) (Texas punishment issues not impermissibly vague).[39]

---

[38]At trial, there were no requests for special instructions or definitions regarding the wording or meaning of the punishment special issues or the terms used therein, nor any objection to the absence of such instructions or definitions.

[39]Moreover, to sustain West's facial challenge would plainly be to adopt a new rule not compelled by precedent existing in 1987

We reject West's claims based on *Penry*, as well as his challenges to the Texas capital sentencing scheme.

## V.   Ineffective Assistance of Counsel at Sentencing

West claims counsel was ineffective in failing to present mitigating evidence at sentencing and in failing to adequately investigate in that respect.[40]

West's amended federal petition alleged in general terms that his counsel was ineffective because he failed to adequately investigate West's "social, educational, health, and medical background and failed to discover facts which, if provided to a psychologist or psychiatrist, would have rendered relevant and significant evidence regarding the defendant's responsibility for the crime as well as his deliberateness and future dangerousness." It is alleged that West's mother abandoned him to her parents

when West's conviction became final, contrary to *Teague*. *See Graham v. Collins*, 113 S.Ct. 892 (1993).

[40]We have already considered and rejected West's claims of ineffective assistance of counsel (and for an evidentiary hearing thereon) in respect to the sufficiency of the evidence of burglary and the taking of the necklace.

In one footnote in his one hundred page appellant's brief—filed on his behalf by the same counsel who represented him below and on his state habeas—West lists various grounds of ineffective assistance of counsel that he assertedly alleged in the district court. Except for those elsewhere addressed in this opinion, none of these claims is briefed or argued, and hence no ruling as to those claims is preserved for appellate review. *See Complaint of Port Arthur Towing v. M/V Miss Carolyn*, 42 F.3d 312, 319 (5th Cir. 1995); *Green v. State Bar of Texas*, 27 F.3d 1083, 1089 (5th Cir. 1994); *Randall v. Chevron U.S.A., Inc.*, 13 F.3d 888, 911 (5th Cir. 1994), *mod. in other respects*, 22 F.3d 568 (5th Cir. 1994); *United States v. Ballard*, 779 F.2d 287, 295 (5th Cir.), *cert. denied*, 106 S.Ct. 1518 (1986). *See also, e.g., United States v. Hoster*, 988 F.2d 1374, 1383 n.25 (5th Cir. 1993); *United States v. Collins*, 972 F.2d 1385, 1393 n.5 (5th Cir. 1992).

shortly after his birth, and his grandparents (described as "very good people" whom West "loved" and was "close to") raised West, who believed they were his real parents until he was approximately twelve years old. He did well in school until he was twelve, and then began having problems, including alcohol and drug abuse. He suffered a head injury of a wholly unspecified sort. After his grandfather died when West was fifteen, West was placed in various juvenile facilities. Attached to West's amended federal habeas petition was an affidavit by psychologist Dr. Brown, who examined West in July 1987 and performed three psychological tests on him. Brown also examined West's school and juvenile facility records, as well as his records after his conviction at the Texas Department of Corrections.[41] This affidavit states that West's "social, educational and athletic development were excellent until the age of twelve." Some time thereafter he was involved in a series of juvenile offenses and was eventually placed in the Illinois Department of Corrections, where he remained until age eighteen. He received some psychological testing there, which reflected an I.Q. of 100. It was also "regularly noted that he had anger and hostility within and poor impulse control" but "seemed typically to respond well to supervision." After release he "continued his drug use as an adult, primarily using angel dust, often combining it with alcohol." In Houston, West and his friends "spent most of their time in bars and on the streets hustling for their money."

---

[41]No part of any of the referenced records is attached to (or quoted in) Brown's affidavit or otherwise of record.

43

Brown reports West "has long suffered from headaches" which "are getting worse now" so he "now takes aspirin by the handful"; he "currently suffers from blurred vision and, on at least one occasion, passed out and fell without explanation." Brown did not make any diagnosis of insanity, incompetence, psychosis, or any particular psychological malady. However, he did opine that "some type of organic brain syndrome" "may exist," confirmation of which would require "a complete neurological examination, CAT scan, and EEG sleep tracing." In support of his "may exist" opinion, Brown stated that the drugs West had been abusing "when taken in significant dosages over a period of years, can be causative to brain tissue pathology" and also referred to West's "history of headaches, flashbacks, blurred vision, multiple head injuries . . . one episode of passing out without explanation and . . . rocking himself prior to sleep."[42] Brown opined that West's murder of Klaus Was "a singular event" and it was "highly unlikely" West would "commit such an offense again." In support of this opinion, Brown principally stressed West's "history of drug abuse and excessive consumption of alcohol the day of the crime"; that the victim was a woman and West, who "experienced problematic relationships with women" harbored "deep-seated anger at women"; that "the killing was done out of loyalty to a friend rather than other criminal behavior like robbery or burglary"; and that West "did not enter the victim's room with the idea of killing her, but did so afterwards

---

[42]No reference is made in this connection to the three tests Brown administered (nor is any documentation concerning these tests or their results of record).

44

in an unusual rage state which was out of character for him."

The affidavit of West's trial counsel, which is wholly uncontradicted on this record, states in part as follows:

> "On August 22, 1982, Mr. West was present in the courtroom of the 182nd District Court and Roy Ashe and I had an opportunity to talk with him. Mr. West appeared lucid and coherent; he was able to and did respond appropriately to the questions that we asked.
>
> During the course of our case preparation, both Roy Ashe [co-counsel] and I visited with Mr. West on numerous occasions. At no time during the course of the investigation, trial preparation, or trial itself did Mr. West give any indication that he was anything other than sane at the time he committed the offense and competent to stand trial. He was able to relate details of the offense and justified the killing on the basis that the victim was at least partially responsible for his friend Brett getting killed. Mr. West communicated freely with Roy Ashe and me during the course of the trial, often asking pertinent questions or providing additional information. In the course of my preparation I asked Mr. West whether he had ever had any psychiatric/psychological problems. While I do not recall his exact response, I feel certain that his response, coupled with my personal observations of Mr. West, foreclosed any potential insanity defense. In my professional opinion I saw no need to have Mr. West undergo a psychiatric examination.

* * * * * *

> In preparation for trial, including the punishment phase, I had Mr. West prepare a background summary of his work history and school history. Unfortunately for the defense, the information provided by Mr. West was not at all helpful and generally damaging. Neither conversations with Mr. West nor his summary provided us with names of people (employers, roommates, schoolmates) who might testify in his behalf at punishment. I personally contacted the grandmother who had raised Mr. West. She refused to testify for him and did not tell me anything that compelled me to subpoena her in spite of her refusal."[43]

---

[43]Defense counsel also retained an investigator, and ultimately "formed the opinion that our strongest defense would be a legal defense rather than a factual defense." Counsel considered the

As we have many times held, "[t]he failure to present a case in mitigation during the sentencing phase of a capital murder trial is not, per se, ineffective assistance of counsel." *Stringer v. Jackson*, 862 F.2d 1108, 1116 (5th Cir. 1988), *vacated and remanded on other grounds*, 112 S.Ct. 1130 (1992), *following remand*, 979 F.2d 38 (5th Cir. 1992) (modifying original opinion in other respects). *See also, e.g., Woods* at 1034-35; *Andrews v. Collins*, 21 F.3d 612, 623-25 (5th Cir. 1994); *Duff-Smith* at 1183; *Lincecum v. Collins*, 958 F.2d 1271, 1278-80 (5th Cir.), *cert. denied*, 506 U.S. 957 (1992); *Wilkerson* at 1065; *DeLuna v. Lynaugh*, 873 F.2d 757, 758-60 (5th Cir.), *cert. denied*, 110 S.Ct. 259 (1989).

West's counsel, from his observations of and discussions with West, and his inquiry of him as to whether "he had ever had any psychiatric/psychological problems," was given no reason to suspect anything significant in that regard, much less any organic brain syndrome. Nothing in Dr. Brown's affidavit even suggests otherwise. There is no allegation—much less any affidavit or other evidence—that West had ever been hospitalized for a head injury or for a mental condition or had ever been diagnosed as having any sort of brain damage or psychosis, or that West ever gave counsel any reason to believe that he had ever suffered a head injury or suffered from any psychiatric or psychological problems. Counsel likewise talked to West's grandmother, who refused to testify for West and provided no useful information. West provided no names of

possibility of other defenses, including "a diminished capacity argument" but concluded it would not be "particularly viable."

46

potential witnesses for the punishment hearing, and the information he did provide "was not at all helpful and generally damaging." West has not even alleged—much less provided any affidavit or other evidence of—anything tending to contradict these statements.[44] Accordingly, counsel was not ineffective for failing to further investigate in these respects. *See, e.g., Andrews* at 623 ("Because counsel had no reason to believe that pursuing further investigation into Andrews' mental capacity or his background would

---

[44]West's response to the magistrate judge's report and recommendation has attached to it a copy of a Motion for Evidentiary Hearing and For Funds For Expert Assistance filed in the state habeas proceeding. The motion is signed by habeas counsel, not by West, and is not verified or supported by affidavit. It alleges that if West were granted a hearing he would call his mother and grandmother. There is no allegation that the grandmother did not talk to West's trial counsel, did not then refuse to testify, or ever provided West's trial counsel with any helpful information; it is merely said that "she will catalogue Robert's excellent record until his twelfth birthday and his subsequent juvenile difficulties." As to the mother, it is alleged she did not see West until nineteen years after she left him with her parents when he was six months old, and will testify to "her son's good qualities and worth" (there is no statement as to the nature or extent of her contact with him after seeing him again, but the record as a whole makes clear it could have only been minimal). This motion also states that West would call "Various [unspecified] Walsh Elementary School counselors and St. Charles Juvenile Home Counselors who worked with Robert [West] and believed he had strong qualities and only required time to mature." No letter, report, affidavit, statement, or other document from the mother, grandmother, or any of the referenced counselors is attached to (or even mentioned in) the motion or otherwise of record. The motion also asserts that West is indigent and requests funds to retain a Dr. Merikangus of Yale University Medical School to perform neuropsychiatric testing, including CAT scan, NMR scan, and EEG testing to show organic brain syndrome affecting "his [West's] ability to control his impulses and behavior"; it is stated that "Dr. Merikangus charges $1,000 a day plus expenses, and estimates that the testing will cost in excess of $5,000"; no report, letter, affidavit, statement, or other document from Dr. Merikangus is attached to (or even mentioned in) the motion or otherwise of record.

be useful, 'counsel's failure to pursue those investigations may not . . . be challenged as unreasonable'" ) (quoting *Burger-Kemp*, 107 S.Ct. 3114, 3126 (1987)); *Wilkerson* at 1065.  *See also Cantu v. Collins*, 967 F.2d 1006, 1016 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 3045 (1993).

Moreover, "[w]e must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' *and* that the 'challenged action might be considered sound trial strategy.'"  *Belye v. Scott*, 67 F.2d 535, 538 (5th Cir. 1995) (emphasis added; quoting *Strickland*, 104 S.Ct. at 2065), *cert. denied*, 116 S.Ct. 1438 (1996).  *See also Wilkerson* at 1065.  "The defendant must overcome the presumption that, under the circumstances, the 'challenged action might be considered sound trial strategy.'"  *Strickland*, 104 S.Ct. at 2065.  In light of the record as a whole, West has neither alleged nor tendered evidence of concrete facts sufficient to overcome those presumptions. Evidence of West's drinking on the afternoon and evening of the offense was before the jury, and evidence that he customarily abused alcohol or drugs or had a juvenile record would be—especially in the pre-*Penry* setting of this trial—at best a two-edged sword.[45]  *See Woods* at 1034; *King v. Lynaugh*, 868 F.2d 1400, 1405 (5th Cir.) ("'jurors are generally unsympathetic toward drug abusers'"), *cert. denied*, 109 S.Ct. 1576 (1989); *DeLuna v.*

---

[45]In cases tried prior to *Penry*, counsel is not defective for failing to anticipate that decision.  *See Woods* at 1034-35; *May v. Collins*, 904 F.2d 228, 234 (5th Cir. 1990), *cert. denied*, 111 S.Ct. 770 (1991).

48

*Lynaugh*, 873 F.2d 757, 759 (5th Cir.), *cert. denied*, 110 S.Ct. 259 (1989). We observed in *Smith v. Black*, 904 F.2d 950, 977 (5th Cir. 1990), *vacated and remanded on other grounds*, 112 S.Ct. 1463 (1992), *aff'd in relevant part*, 970 F.2d 1383 (5th Cir. 1992), that although certain "mitigating evidence might have been presented" but was not, nevertheless "it is equally possible that Smith's trial counsel had sound strategic reasons for not presenting it, and we cannot speculate that Smith was unconstitutionally impaired by any ineffective assistance on such an allegation."[46]

West has not shown that his counsel was constitutionally defective.

Moreover, not only has West failed to show that his counsel's performance was defective, he has also failed to show the requisite *Strickland* prejudice. Even if Dr. Brown had testified as stated in

---

[46]We have held that counsel was not ineffective for insufficiently investigating as to whether West suffered from some sort of organic brain syndrome or significant mental illness because there was nothing to *factually* put counsel on notice of any reasonable likelihood that any such condition existed. We further note that in this pre-*Penry* case there was nothing to put counsel on notice that such an investigation might be *legally* fruitful, *i.e.*, that if there were such a condition it would be helpful to West to introduce evidence of it. *See Andrews* at 625 (failure to introduce evidence of defendant's "'brain damage would have been a reasonable strategic decision; after all, such evidence is double-edged'"); *Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir. 1994) (same). And, evidence of "anger and hostility within," "poor impulse control," and "deep-seated anger at women" also plainly fall within this category. Indeed, in West's response to the magistrate judge's report and recommendation, it is stated that "the overwhelming inference" is that trial counsel's failure to present mitigating evidence "was a direct result of trial counsel's judgment that he was precluded from presenting the mitigating evidence available to him because it would prejudice his client given the Texas [capital sentencing] scheme," particularly the second (future dangerousness) issue.

his affidavit, and even if it were shown that West had a history of drug and alcohol abuse, and had some character of organic brain syndrome that diminished his "ability to control his impulses and behavior," and even if his grandmother and counselors were to have testified to his good behavior in grade school (see note 43, *supra*), we are convinced that there is no reasonable probability—no probability sufficient to undermine our confidence in the sentencing (or the guilty) verdict—that the outcome would have been different. *Strickland*, 104 S.Ct. at 2068. West forced his way into the room of the victim—a woman he barely knew—in the middle of the night, and admitted that he had gone there with intent to kill her. He did so in a most brutal and savage manner, but only after putting her through a horrifying and degrading series of assaults that must have produced the most exquisite mental anguish. His asserted reason for doing so—that he believed she had identified Barstow to Longfellow, resulting in Barstow's death—was most unlikely to favorably impress any reasonable jury. Among other things, there is absolutely nothing to suggest that West even believed that Klaus' asserted identification of Barstow was other than wholly innocent and without knowledge of the supposed danger to which it exposed Barstow. Moreover, there is nothing to suggest that West had any real reason, beyond pure speculation, to believe that Longfellow killed Barstow or had him killed. Finally, all this simply makes matters worse for West as it was he who committed the premeditated, unprovoked, vicious, and almost fatal stabbing and robbery of Longfellow. And, it is simply ludicrous to imagine

that a jury considering Klaus' murder would be favorably inclined to West even if it believed Dr. Brown's theory that he acted from "deep-seated anger at women."  Nor would such a theory, or Dr. Brown's related theory that West was not otherwise violent or inclined to criminal violence such as robbery, likely be given any significance and weight by a jury that heard the undisputed evidence of West's wholly premeditated and unprovoked robbery and almost fatal vicious knifing and assault of Longfellow.  This premeditated Longfellow offense also undermines any theory that West was violent only because of lack of impulse control. *Strickland* prejudice is not shown.  *See, e.g., Glass v. Blackburn*, 791 F.2d 1165, 1170-71 (5th Cir. 1986).  *See also, e.g., Woods* at 1035; *Andrews* at 624-25; *Duhamel v. Collins*, 955 F.2d 962, 966 (5th Cir. 1992); *Wilkerson* at 1065.

West asserts he was entitled to a federal evidentiary hearing. We disagree.  "'[I]f the record is clearly adequate to fairly dispose of the claims of inadequate representation, further inquiry is unnecessary.'"  *DeLuna* at 760 (quoting *Byrne v. Butler*, 845 F.2d 501, 512 (5th Cir.), *cert. denied*, 108 S.Ct. 2918 (1988)).  "[N]o hearing is necessary because the state court record contains adequate, relevant evidence on the factual basis for an ineffectiveness claim."  *Lincecum v. Collins*, 958 F.2d 1271, 1280 (5th Cir.), *cert. denied*, 506 U.S. 957 (1992).  West makes no concrete or specific factual allegations, much less submits any affidavits or other evidence, disputing the statements in trial counsel's affidavit filed in the state habeas proceedings or

51

otherwise tending to show an entitlement to habeas relief. He was thus not entitled to an evidentiary hearing. *Russell v. Lynaugh*, 892 F.2d 1205, 1212-1214 (5th Cir. 1989), *cert. denied*, 111 S.Ct. 2909 (1991). Moreover, the state properly moved for summary judgment, and the full state record (before the district court below) *prima facie* entitled it to judgment, but West, who had the burden of proof, filed no opposing summary judgment evidence other than the affidavit of Dr. Brown, which does not establish either the deficient performance or the prejudice prong of *Strickland*. Summary judgment was thus proper. *See, e.g., Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075-76 (5th Cir. 1994) (en banc).

West also argues that the district court should not have accorded the presumption of correctness to the state trial habeas court's findings because the state court did not afford West a "live" evidentiary hearing but instead relied on affidavits, and because the state trial court was biased against him. These contentions do not entitle West to relief. To begin with, the record before the district court below, wholly apart from the state habeas trial court's findings and conclusions, failed to demonstrate any genuine dispute as to any material fact that, if resolved in West's favor, would entitle him to habeas relief. As noted, the affidavits of West's counsel are undisputed. Indeed, West does not even allege concrete, specific facts that, in light of the state record (exclusive of the state trial habeas court's findings and conclusions), dispute such affidavits or otherwise would entitle West to relief. Any defect in the state trial

52

court's habeas proceedings is immaterial.[47]

_____

[47]Moreover, we disagree with West's claims that the state habeas court's findings were not entitled to the presumption of correctness under 28 U.S.C. § 2254(d). The fact that a "live" hearing was not held is not controlling, and the state habeas court can generally even resolve conflicts in affidavits, where the judge who presided at trial also presides at the habeas hearing, as was the case here. *See May v. Collins*, 955 F.2d 299, 311-314 (5th Cir.), *cert. denied*, 112 S.Ct. 1925 (1992); *Carter v. Collins*, 918 F.2d 1198, 1202 (5th Cir. 1990). *See also Perrillo v. Johnson*, 79 F.3d 441, 446-47 (5th Cir. 1996). Moreover, as we said in *Lincecum*, "here the state [habeas] court was not even faced with competing affidavits," *id*. at 1279, and so there was thus nothing to have a "live" hearing about.

West's claim of bias on the part of the state trial habeas court does not change the result. With his unverified opposition to the magistrate judge's report, West filed a transcript of the August 25, 1987, proceedings before the state habeas court, which reflects an unsworn argument by West's habeas counsel on an asserted August 24, 1987, oral motion to recuse the state trial judge (which motion to recuse does not appear of record); the oral motion was allegedly based on the state trial court's having indicated to West's habeas counsel in chambers on June 12, 1987, the day West's execution date was set for July 15, 1987, that the court had "a relationship" with West's trial counsel and thought highly of him and that he had done a good job representing West, and that "the only action this Court would like to be involved in in the future with regard to Mr. West would be to see the motherfucker fried." On July 9, 1987, West (represented by the same habeas counsel throughout) filed his state habeas petition in the state trial court (on July 13, 1987, the state trial court reset West's execution date for September 2, 1987) and he filed an amended state habeas petition on August 23, 1987, and on August 24, 1987, a state habeas motion for evidentiary hearing and for funds for expert assistance; in *none* of these filings does West seek recusal of the state trial judge, though he had known of the alleged grounds since June 12; nor did West ever raise any such matter in the Court of Criminal Appeals) (whose decision was entered August 31), which is the only court empowered to finally act on the writ. *Briddle* at 375 & n.18. No valid reason for not raising the matter earlier has been suggested. Any denial of West's alleged oral motion was not improper, due to its lateness and obvious delaying purpose. Since the motion, if any, was untimely and not in writing (or verified), under Texas law it did not have to be acted on by another judge. *See DeBlanc v. State*, 799 S.W.2d 701, 705 (Tex. Crim. App. 1990). Moreover, the alleged comment about West (even if the state court were required to trust an unverified statement as to an unrecorded remark made more than two months previously, which it was not) was obviously based on matters learned at trial and, though inappropriate, does not reveal

53

We reject West's contentions on appeal respecting ineffective assistance of counsel and the denial of an evidentiary hearing.

## Conclusion

For the reasons stated, we affirm the district court's denial of habeas relief.[48]

AFFIRMED.

---

"such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States,* 114 S.Ct. 1147, 1157 (1994). This is particularly so where there were no conflicts in the evidence to resolve and no need for a hearing. *Cf. Lincecum* at 1279, 1280.

[48]After West's appeal was lodged in this Court, West, through counsel, moved in this Court "to Enlarge the Record" to include an affidavit of counsel, likewise executed by counsel after this appeal was filed, concerning matters allegedly known to counsel well prior to the filing of the state's motion for summary judgment below. The state has opposed the motion. We deny it. None of what is sought to be included was filed or tendered to the district court below (or to the state courts) and no good reason appears why it was not. All other pending undisposed of motions are denied. All stays of execution heretofore entered herein are vacated.